In re SCOTT COUNTY
MASTER DOCKET.

Greg MYERS and Jane Myers, individually and as parents and natural guardians of Andy Myers, Amy Myers and Brian Myers, minors, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney, Scott County Welfare Department, and Peg Subby, its Director of Human Services, Thomas Price, and Phipps–Yonas & Price, P.A., Paul Thomsen, Guardian ad Litem, Doris Wilker Social Worker, and other employees of Scott County Human Services whose names and titles are unknown, Defendants.

Duane RANK and Dee Rank, Plaintiffs,

v.

R. Kathleen MORRIS, individually and as Scott County Attorney; and John Doe Numbers 1–15, individually and as employees and agents of Scott County, a political subdivision of the State of Minnesota, and Scott County, Defendants.

Charles LALLAK and Carol Lallak, husband and wife; and Jeffrey Lallak and Jennifer Lallak, minors, by Charles Lallak and Carol Lallak, their parents and natural guardians, Plaintiffs,

v.

SCOTT COUNTY; Scott County Attorney's Office; R. Kathleen Morris, Scott County Attorney; Scott County Sheriff's Department, Douglas Tietz, Scott County Sheriff; Michael M. Busch, Scott County Deputy Sheriff; Patrick Morgan, Scott County Deputy Sheriff; David Einertson, Scott County Deputy Sheriff; Norman Pint, Scott County Deputy Sheriff; other employees of Scott County Sheriff's Department whose names and titles are unknown; Scott County Human Services Department; Rachel Paff, Social Worker with Scott County Human Services Department; other employees of Scott County Human Services Department whose names and titles are unknown; City of Jordan, Jordan City Council; Gail Anderson, former mayor of Jordan; Donald Tillman, Mayor of Jordan; Jordan Police Department; Alvin Erickson, Jordan Police Chief; Larry Norring, Officer with Jordan Police Department; other employees of Jordan Police Department whose names and titles are unknown; Thomas L. Price, and Phipps–Yonas & Price, P.A., Defendants.

Donald BUCHAN and Cindy Buchan, individually and as parents and natural guardians of Courtney Beth Buchan, Melissa Ellen Buchan, and William Donald Buchan, minors, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney, Scott County Human Services, and Peg Subby, its Director of Human Services, Thomas Price, and Phipps–Yonas & Price, P.A., Michael Shea and Shea & Associates, P.A., Diane Johnson, Guardian ad Litem, John Manahan, Guardian ad Litem, Doris Wilker, Social Worker, Mary Tafs, Social Worker, Judy Dean, Social Worker, Susan Devreis, Psychologist, and other employees of Scott County Human Services whose names and titles are unknown, and Douglas Tietz, Scott County Sheriff, Defendants.

Daniel J. MEGER and Wanda Lou Meger, individually and as parents and natural guardians of Brian Meger and Chad Meger, minors, Plaintiffs,

v.

SCOTT COUNTY, a political subdivision of the State of Minnesota; R. Kathleen Morris, individually and in her official capacity as attorney for Scott County; Scott County Welfare Department and Margaret Subby, its Director of Human Services; Scott County Sheriff's Department and its deputies, Patrick Morgan and Michael Busch; Doris Wilker, Social Worker, Scott County Welfare Department; Joel Kaufmann, psychologist, Scott County Welfare Department; Jane McNaught, and Center for Child and Family Therapy; B.A. Bershow, M.D., and Burnsville Family Physi-

cians, P.A.; John Doe and Mary Doe and other employees of Scott County whose names and titles are unknown, Defendants.

Robert BENTZ and Lois Bentz, individually and as parents and natural guardians of Marlin Bentz, William Bentz and Anthony Bentz, minors, Plaintiffs,

v.

SCOTT COUNTY; R. Kathleen Morris, Scott County Attorney; Margaret Subby, Scott County Welfare Department/Director of Human Services; Doris Wilker, Social Worker, Scott County Welfare Department; Paul Thomsen, Guardian ad Litem; Michael Busch, Patrick Morgan and Norman Pint, Scott County Deputy Sheriffs; Michael Shea, Leslie Faricy, Michael Shea and Associates; and John Doe and Mary Roe; and other employees of Scott County Human Services whose names and titles are unknown, Defendants.

Thomas and Helen BROWN, individually and as parents and natural guardians of Brandy Brown and Jeff Brown, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney, Scott County Welfare Department and Peg Subby, its Director of Human Services, Susan Phipps–Yonas and Phipps–Yonas & Price, P.A., John Manahan and Diane K. Johnson, Guardian ad Litems, Doris Wilker Social Worker, and other employees of Scott County Human Services whose names and titles are unknown, Defendants.

Judith Ann KATH, Plaintiff,

v.

R. Kathleen MORRIS, individually and as Scott County Attorney; and unnamed Scott County employees, individually and as employees and agents of Scott County, a political subdivision of the State of Minnesota, and Scott County, Defendants.

Coralene RAWSON, individually and as a parent and natural guardian of Sarah Rawson, Plaintiff,

v.

SCOTT COUNTY, R. Kathleen Morris, Scott County Attorney; Scott County Human Services and Peg Subby, Director of Scott County Human Services; Diane Johnson, Guardian ad Litem of Sarah Rawson; John Manahan, Guardian ad Litem of Sarah Rawson; Doris Wilker, Social Worker for Scott County Human Services; Karen Kandig, Social Worker for Scott County Human Services; Douglas Tietz, Scott County Sheriff; Patrick Morgan, Scott County Deputy Sheriff; Larry Norring, Scott County Deputy Sheriff; Michael Busch, Scott County Deputy Sheriff; Hubert H. Humphrey III, as Minnesota Attorney General and individually; Norman Coleman, as Assistant Minnesota Attorney General and individually; Michael Jordan, as Attorney General and individually; Charles Black, as Assistant Ramsey County Attorney, and individually; Wright Walling Attorney for Sarah Rawson and Diane Johnson, Guardians ad Litem, Defendants.

Irene MEISINGER; and Jeanie M. Meisinger and James R.H. Meisinger, by Irene M. Meisinger, their mother and natural guardian, Plaintiff,

v.

SCOTT COUNTY: R. Kathleen Morris, Scott County Attorney; Scott County Sheriff's Department; Douglas Tietz, Scott County Sheriff; Deputy Sheriff Patrick Morgan; other employees of the Scott County Sheriff's Department whose names and titles are unknown; Larry Norring, Officer with Jordan Police Department; Scott County Human Services Department; Doris Wilker, Social Worker; Mary Tafs, Social Worker; and James Poulos, Social Worker, Defendants.

Robert L. RAWSON, individually and as parent and natural guardian of Sarah Naomi Tiffany Rawson, Plaintiffs,

v.

SCOTT COUNTY and R. Kathleen Morris, Scott County Attorney; Scott County Sheriff Douglas Tietz; Scott County

Deputy Sheriffs Patrick Morgan, Michael Busch, Norman Pint and David Einertson; Scott County Human Services Department and Margaret Subby, Director of Human Services; Social Worker Doris Wilker; and other Scott County officials or employees as yet unknown, Defendants.

John JOE and Jane Joe, individually and as the parents and guardians of Tom Joe, Jim Joe, and Linda Joe, their minor children, Plaintiffs,

v.

SCOTT COUNTY; Scott County Attorney's Office; R. Kathleen Morris, individually and in her official capacity; Scott County Sheriff's Office; David Einertson, individually and in his official capacity; Michael Busch, individually and in his official capacity; Norman Pint, individually and in his official capacity; Scott County Human Services Department; Margaret Subby, individually and in her official capacity; Thomas Behr, individually and in his official capacity; Rachel Paff, individually and in her official capacity; and Victor Ellingson, individually and in his official capacity, Defendants.

Scott GERMUNDSON, Marlene Germundson, Sara Germundson and Melissa Germundson, Plaintiffs,

v.

SCOTT COUNTY; Scott County Attorney's Office; R. Kathleen Morris, Scott County Attorney; R. Gehl Tucker, Nancy Platto, Miriam Wolfe, Mary Tafs, Karen Kandik, Paul Thomson; Scott County Sheriff's Department; Douglas Tietz, Scott County Sheriff; Michael M. Busch, Scott County Deputy Sheriff; Patrick Morgan, Scott County Deputy Sheriff; David Einertson, Scott County Deputy Sheriff; Norman Pint, Scott County Deputy Sheriff; other employees of Scott County Sheriff's Department whose names and titles are unknown; Scott County Human Services Department; Doris Wilker, Social Worker with Scott County Human Services Department; Margaret Subby, Director of Scott County Human Services;

Other employees of Scott County Human Services Department whose names and titles are unknown; Larry Norring, Officer with Jordan Police Department; Susan Phipps–Yonas, and Phipps–Yonas & Price, P.A., Defendants.

Terry MORGENSON, Plaintiff,

v.

SCOTT COUNTY; Scott County Attorney's Office; R. Kathleen Morris, Scott County Attorney, R. Gehl Tucker, Nancy Platto; Scott County Sheriff's Department; Douglas Tietz, Scott County Sheriff; Michael M. Busch, Scott County Deputy Sheriff; Patrick Morgan, Scott County Deputy Sheriff; David Einertson, Scott County Deputy Sheriff; Norman Pint, Scott County Deputy Sheriff; other employees of Scott County Sheriff's Department whose names and titles are unknown; Scott County Human Services Department; Doris Wilker, Social Worker with Scott County Human Services Department; Margaret Subby, Director of Scott County Human Services; other employees of Scott County Human Services Department whose names and titles are unknown; Thomas L. Price, and Phipps–Yonas & Price, P.A., Defendants.

Civ. Nos. 3–85–774, 4–84–1066, 4–84–1214, 4–84–1230, 3–84–1615, 3–85–138, 4–84–1204, 4–84–1208, 3–85–1091, 3–85–1690, 4–85–869, 3–85–1754, 4–85–1594 and 4–86–139.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 2, 1987.

Marc G. Kurzman, Kurzman, Grant, Manahan, Bluth & Barker, and David W. Larson, Minneapolis, Minn., for plaintiffs Greg Myers and Jane Myers, individually and as parents and natural guardians of Andy Myers, Amy Myers and Brian Myers, minors; and for plaintiffs Donald Buchan and Cindy Buchan, individually and as parents and natural guardians of Courtney Beth Buchan, Melissa Ellen Buchan, and William Donald Buchan, minors.

John R. Wylde and James William Hunter, Rapoport, Wylde & Nordby, Minneapolis, Minn., for plaintiffs Duane Rank and Dee Rank.

Thomas J. Hunziker, Hanley, Hergott & Hunziker, Minneapolis, Minn., for plaintiffs Charles Lallak and Carol Lallak; John Joe and Jane Joe, individually and as the parents and guardians of Tom Joe, Jim Joe, and Linda Joe, their minor children; Sara Germundson and Melissa Germundson; and Terry Morgenson.

Michael D. Madigan, Emundson, Johnson & Madigan, Minneapolis, Minn., for plaintiffs Jeffrey Lallak and Jennifer Lallak.

Patrick H. Elliott, Murphy, Blanchar & Elliott, Minneapolis, Minn.; Anthony L. Noterman, Shakopee, Minn.; David E. Albright, Albright, Blanchar & Elliott, P.A., Bloomington, Minn., for plaintiffs Daniel J. Meger and Wanda Lou Meger, individually and as parents and natural guardians of Brian Meger and Chad Meger, minors.

Barry V. Voss, Minneapolis, Minn., and Earl P. Gray, St. Paul, Minn., for plaintiffs Robert Bentz and Lois Bentz, individually and as parents and natural guardians of Marlin Bentz, William Bentz and Anthony Bentz, minors.

Robert G. Gubbe, Robert M. Frisbee, Edina, Minn., for plaintiffs Thomas and Helen Brown, individually and as parents and natural guardians of Brandy Brown and Jeff Brown.

Stan Nathanson, Minneapolis, Minn., for plaintiff Judith Kath.

Robert A. Nicklaus, Nicklaus, Monroe, Fahey & Cooper, Chaska, Minn., for plaintiff Coralene Rawson, individually and as a parent and natural guardian of Sarah Rawson.

Cortlen G. Cloutier, Joseph F. Lyons–Leoni, Cloutier & Musech, Minneapolis, Minn., for plaintiffs Irene Meisinger and Jeanie M. Meisinger and James R.H. Meisinger by Irene M. Meisinger, their mother and natural guardian.

William M. Orth, Dudley & Smith, St. Paul, Minn., for plaintiff Robert L. Rawson, individually and as parent and natural guardian of Sarah Naomi Tiffany Rawson.

Corey L. Gordon, Minneapolis, Minn., for plaintiffs John Joe and Jane Joe, individually and as the parents and guardians of Tom Joe, Jim Joe, and Linda Joe, their minor children.

Paul W. Rogosheske, Thuet, Lynch, Pugh & Rogosheske, South St. Paul, Minn., for plaintiffs Scott Germundson and Marlene Germundson.

Richard J. Chadwick and Jon K. Iverson, Chadwick, Johnson & Condon, P.A., Minneapolis, Minn., for defendants Scott County, a political subdivision of the State of Minn.; and Richard A. Beens (of counsel for Scott County), Steffen, Munstenteiger, Beens, Parta & Peterson, Anoka, Minn.

Donald F. Hunter and David Sturges, Gislason, Dosland, Hunter & Malecki, Minnetonka, Minn., for defendants Scott County Human Services; Peg Subby, its Director of Human Services; Doris Wilker, Social Worker; Rachel Paff, Social Worker with Scott County Human Services Dept.; Mary Tafs, Social Worker; Judy Dean, Social Worker; James Poulos, Social Worker; Joel Kaufmann, Psychologist, Scott County Welfare Dept.; Karen Kandig, Social Worker for Scott County Human Services; and other employees of Scott County Human Services, whose names and titles are unknown; and Richard F. Rosow, Lang, Pauly & Gregerson, Ltd. (of counsel, for Joel Kaufmann), Minneapolis, Minn.

James T. Martin, Gislason, Martin & Varpness, P.A., Edina, Minn., for defendants Scott Co. Atty. R. Kathleen Morris, Asst. Scott Co. Atty. Miriam Wolf, and Scott County Deputy Sheriffs Michael Busch, Norman Pint, Patrick Morgan and

David Einertson, and other employees of Scott County Sheriff's Dept. whose names and titles are unknown, and Joan S. Morrow, Rider, Bennett, Egan & Arundel (for Scott County Deputy Sheriff Patrick Morgan), Minneapolis, Minn.

Loren M. Barta, New Prague, Minn., for defendant Douglas Tietz, Scott County Sheriff.

James O. Redman, Collins, Buckley, Sauntry & Haugh, St. Paul, Minn., and Frederick C. Brown, Robert H. Lynn, Thomas J. Radio, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., and Phillip R. Krass, Krass, Meyer & Walsten, Shakopee, Minn., for defendants City of Jordan; Jordan City Council; Alvin Erickson, Jordan Police Chief; Larry Norring, Officer with Jordan Police Dept.

James F. Roegge and Douglas Muirhead, Meagher, Geer, Markham, Anderson, Flaskamp & Brennan, Minneapolis, Minn., for defendant Susan Devreis, Psychologist.

Mark N. Stageberg, Lommen, Nelson, Sullivan & Cole, P.A., Minneapolis, Minn., for defendant Jane McNaught.

John R. McBride, Alan Bradbury, Donlin & McBride, P.A., St. Paul, Minn., for defendant B.A. Bershow, M.D.

John M. Degnan, Charles Lundberg, Bassford, Heckt, Lockhart & Mullin, P.A., Minneapolis, Minn., for defendants Diane Johnson, Guardian ad Litem of Sarah Rawson; John Manahan, Guardian ad Litem of Sarah Rawson; and Wright Walling, for Sarah Rawson and Diane Johnson, Guardian ad Litem.

Hubert H. Humphrey, III, Atty. Gen., State of Minn., and Richard S. Slowes, Asst. Sol. Gen., St. Paul, Minn., for defendants Hubert H. Humphrey, III, as Minnesota Atty. Gen. and individually, Norman Coleman, as Asst. Minnesota Atty. Gen., and individually, Michael Jordan, as Atty. Gen. and individually; Charles Black, as Asst. Ramsey Co. Atty.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This case is before the Court for the second time on the motions of various plaintiffs and all defendants, including for the first time Scott County, for summary judgment. This long, sordid, and troubling matter, which has bitterly divided a community, ended a prosecutorial career, turned family members against family members, and almost certainly irretrievably harmed children, must come to an end. The Court, based upon the facts and the law, has concluded that judgment should be entered in favor of all defendants in all respects.

## FACTS

Before the Court are fourteen civil rights lawsuits which grew out of a child sexual abuse investigation in Jordan, Minnesota during 1983–84. The facts of the case are ably set forth in *In re Scott County Master Docket*, 618 F.Supp. 1534 (D.Minn. 1985), and *Myers v. Morris*, 810 F.2d 1437 (8th Cir.1987), and will not be extensively repeated here. In *Myers* the United States Court of Appeals for the Eighth Circuit affirmed the Court's order granting summary judgment in favor of the guardians ad litem, therapists, Jordan defendants (including Larry Norring), and the Scott County Board of Commissioners in the *Myers*, *Rank*, *Lallak*, *Buchan*, *Meger*, *Bentz* and *Brown* cases, and for all defendants in the *Gould* case. In addition, the Court directed summary judgment for County Attorney R. Kathleen Morris, Sheriff Douglas Tietz and the deputy sheriffs in these cases and for therapist DeVries in *Buchan*. In the interim between the Court's 1985 decision and the Eighth Circuit's ruling in *Myers* several additional plaintiffs filed suit. Those cases were consolidated with existing cases for purposes of discovery and pretrial motions. The facts of these new cases are set forth below. Discovery is now complete. All defendants now move for summary judgment as to all complaints filed against them and not otherwise disposed of in *Myers*.

## NEW CASES

### Judy Kath

Judy Kath is the mother of V. Kath, one of the children who initially identified James Rud as a child abuser. Judy Kath

was identified as a suspect in interviews conducted with Marlene Germundson and Germundson's twin daughters. The statements of Marlene Germundson corroborated information furnished in interviews with V. Kath, who described sexual activities between children and adults at the Rud residence. A criminal complaint charging Judy Kath with multiple counts of child sexual abuse issued November 14, 1983. Kath was arrested on that date. A second complaint against Kath issued November 16, 1983 based upon incriminating information furnished by V. Kath in a November 15, 1983 interview. Each of the Kath complaints was reviewed by a state court judge who found probable cause for the issuance of arrest warrants. On the date of Kath's arrest, V. Kath was taken into protective custody. A neglect petition was filed in family court November 17, 1983, and at the conclusion of a hearing conducted on that date the court ordered that legal custody of V. Kath be vested in the Scott County Human Services Department. V. Kath's biological father was given custody for a period of time, but was later relieved of custody at his request.

As with the other Scott County defendants, charges against Judy Kath were dropped by the county attorney October 15, 1984. Family court proceedings continued, and ultimately the court terminated Kath's parental rights.

Kath filed suit July 8, 1985, naming Morris, the Scott County Commissioners, "unnamed" Scott County agents and employees and Scott County as defendants. By stipulation of dismissal with prejudice filed January 23, 1986 the Scott County Commissioners were dismissed from the suit.

**Marlene and Scott Germundson**

The Germundsons are parents of twin daughters, M. and S. Germundson. In interviews conducted with deputy Michael Busch November 10, 1983 the Germundson children furnished incriminating information which implicated Marlene Germundson. This information was corroborated by physical examinations of the Germundson children conducted November 4, 1983 by pediatrician Caroline Levitt. The physical examination revealed that both children, aged 5 at the time, had been sexually penetrated. At a November 10, 1983 interview conducted at the Scott County Sheriff's office Marlene Germundson allegedly admitted that she had knowledge of nude photographs taken of her children by James Rud at Judy Kath's residence; that she had been present at Rud's residence on an occasion when she "assumed" that Rud was engaged in sexual activity with her children in Rud's bedroom; that her children had revealed to her in April or May 1983 that Rud was sexually abusing them; and that notwithstanding her knowledge of alleged sexual abuse, she continued to frequent the Rud residence with her children to the date of Rud's arrest. Following the November 10, 1983 interview Marlene Germundson was placed under arrest. On that date the Germundson children were taken into protective custody and placed in emergency foster care. A neglect petition was filed in family court November 15, 1983. By order dated December 1, 1983 the family court assumed custody of the children and ordered psychological evaluations. By stipulation dated February 9, 1984 an adjudicatory hearing on the neglect petition was continued indefinitely and all time limitations under the juvenile court rules were waived. The matter of parental visitation was left to the children's guardian ad litem and the psychologist in charge of evaluating the children. In September 1984 the family court granted Scott and Marlene Germundson supervised visitation at the office of the Scott County Human Services Department (HSD).

Scott Germundson was first implicated as a suspected child abuser in interviews of C. Lebens and J. Olson conducted by Jordan police officer Larry Norring on February 3 and February 7, 1984. Germundson was arrested February 27, 1984 pursuant to a probable cause warrant signed by a state court judge. As with the other Scott County defendants, all charges against the Germundsons were dismissed October 15, 1984.

Scott Germundson filed suit February 20, 1986 naming as defendants Scott County,

Morris, Tietz, various deputies and social workers, the Scott County HSD, Larry Norring and a psychologist who treated his children. Germundson's claims against the psychologist were subsequently dismissed by stipulation. Marlene Germundson filed suit March 4, 1987 naming twenty-three defendants, including the Scott County Attorney's office, Sheriff's department, Morris, Tietz, various deputies and social workers. By stipulation dated June 24, 1987 plaintiffs dismissed with prejudice all claims asserted against Joel Kaufman and Joan Dickinson, therapists who counseled the children.

**Irene Meisinger**

Irene Meisinger is the mother of J.M. and J.R.H. Meisinger. In separate interviews conducted November 17 and November 26, 1983 Meisinger was identified as a child abuse suspect by J.M. and J.R.H. Meisinger, V. Kath and S. Krahl. On the basis of these allegations the Meisinger children were taken into protective custody and on November 23, 1983 a neglect petition was filed. A custody hearing was conducted November 30, 1983 on which date the family court directed the continued placement of the Meisinger children in foster care while assuming custody of the children. Irene Meisinger was ordered not to have contact with the children. On November 30, 1983 Irene Meisinger was arrested and charged with twelve counts of criminal sexual conduct in the first and second degree. Meisinger's arrest followed a state court judge's determination that probable cause for arrest had been demonstrated.

As with the other Scott County defendants, all charges against Meisinger were dismissed October 15, 1984. The Meisinger children were returned to the custody of Irene Meisinger in March 1985 pursuant to order of the family court dated February 25, 1985.

Irene Meisinger filed suit May 10, 1985 naming Scott County, Morris, the Scott County Sheriff's Department, Tietz, Norring, various deputies, HSD and various social workers as defendants. Meisinger has stipulated to dismissal of the Sheriff's Department as a defendant.

**Terry Morgenson**

Terry Morgenson is an employee in the Scott County Assessor's office. Morgenson was first implicated as a suspected child abuser in interviews of A.M. and A.N. Myers conducted May 30, and June 4, 1984. Morgenson was arrested June 4, 1984 and charged with two counts of criminal sexual misconduct. The arrest of Morgenson was a probable cause arrest effectuated without the benefit of a warrant by agent Patrick Shannon of the Minnesota Bureau of Criminal Apprehension. As with the other Scott County defendants, all charges against Morgenson were dismissed October 15, 1984.

Morgenson filed suit February 20, 1986 naming the Scott County Attorney's office and Sheriff's Department, Morris, Tietz and various deputies and social workers as defendants. By stipulation dated July 2, 1986 psychologists named as defendants in the complaint were dismissed from the case.

**Coralene and Robert Rawson**

Robert and Coralene Rawson are parents of four grown children who are not the subject of these lawsuits or otherwise implicated in this matter. The Rawsons also have an adoptive daughter, S. Rawson, whose biological mother is Coralene Rawson's sister. Robert Rawson was first implicated as a suspected child abuser in interviews of V. Arendsee and V. Kath conducted November 23, 1983. V. Arendsee (daughter of Judy Kath) claimed that Rawson had sexually abused her at least twenty times dating to 1979. V. Kath claimed that Rawson had abused her at least seven times during that period. Rawson was arrested November 22, 1983 and charged with criminal sexual conduct in the first degree. Subsequently, in a March 6, 1983 interview conducted by detective Patrick Shannon of the Minnesota Bureau of Criminal Apprehension, S. Krahl identified Robert Rawson as a suspected child abuser. Additional charges against Rawson were filed March 19, 1984 based on these allegations. Thereafter, S. Rawson, V. Kath and

Robert Kath, 18–year–old son of Judy Kath, implicated Rawson in claims of child sexual abuse. Additional charges against Robert Rawson were filed and Rawson was arrested March 30, 1984 based on the allegations of S. Rawson and V. Kath and Robert Kath.

In an interview conducted March 26, 1983 S. Rawson identified her adoptive mother, Coralene Rawson, as an adult who had participated in acts of child sexual abuse. V. Kath likewise made statements which implicated Coralene Rawson. Allegations against the Rawsons were corroborated in part by physical evidence recovered from the Kath residence, including miniature bowling pins, and candles contaminated with human feces, and by a physical examination of S. Rawson conducted March 26 and 29, 1984 by Dr. Barry Bershow, which was partially confirmatory of sexual abuse.

S. Rawson was taken into protective custody March 22, 1984 and placed in emergency foster care. A neglect petition was filed March 26, 1984. By order Dated March 28, 1984 the family court assumed immediate custody of S. Rawson with a finding that there was probable cause that a juvenile protection matter existed and that the release of S. Rawson would endanger her health and welfare. The court continued S. Rawson's foster care placement following a placement review hearing on April 11, 1984. By order dated September 24, 1984 following an eleven-day trial, the court found that S. Rawson had been sexually abused and was neglected. The court's findings were vacated November 9, 1984 following S. Rawson's recantation of her trial testimony. Following a second trial, by order dated April 22, 1986 the court again found S. Rawson dependent and neglected and her placement in foster care was continued. This decision was overturned by the Minnesota Court of Appeals on other grounds. *See In the Matter of the Welfare of S.N.T.R.*, 403 N.W.2d 293, 297 (Minn.App.1987). A new petition was subsequently filed and S. Rawson remains in foster care. As with the other Scott County defendants, all charges against the Rawsons were dropped October 15, 1984.

Coralene Rawson filed suit October 18, 1985, naming Scott County, the Scott County HSD, Morris, Tietz, various deputies and social workers, and the Minnesota Attorney General as defendants. Robert Rawson filed suit November 1, 1985, naming Scott County, the Scott County HSD, Morris, Tietz and various social workers and deputies as defendants.

## DISCUSSION

### A. Social Workers [1]

Various employees of the Scott County Human Services Department (HSD) are named as defendants in these actions (hereinafter "social workers"). Doris Wilker, a social worker with the Scott County HSD since 1981, is named in the *Bentz, Brown, Germundson, Meger, Meisinger* and *Myers*

---

1. A number of subsidiary points raised in these cases are no longer disputed and may be summarily disposed of. Several plaintiffs raised claims for punitive damages against Scott County. These plaintiffs now acknowledge that Scott County may not be subjected to punitive damages in a case arising under 42 U.S.C. § 1983. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Additionally, some plaintiffs named non-legal entities such as the Scott County Attorney's Office and Scott County Sheriff's Department as defendants. These departments or offices are not legal entities subject to suit; therefore, the claims against them must be dismissed. *See Hancock v. Washtenaw County Prosecutor's Office,* 548 F.Supp. 1255 (E.D.Mich.1982); *Ragusa v. Police Department,* 530 F.Supp. 814 (N.D.Ill. 1981); *Garcia v. County of Los Angeles,* 588 F.Supp. 700 (C.D.Cal.1984); *Wagner v. Genesee County Board of County Commissioners,* 607 F.Supp. 1158 (E.D.Mich.1985).

Coralene Rawson has now agreed to dismiss all claims against all defendants. Because Rawson's section 1983 claims are without merit, her federal claims will be dismissed with prejudice; however, her state law claims will be dismissed without prejudice as outside the Court's pendent jurisdiction. Robert Rawson has now stipulated to dismissal of all claims brought by him with the exception of a claim of excessive force in connection with his arrest. Defendants have moved for summary judgment as to this excessive force claim, which will be discussed separately. Finally, any and all claims against therapists, guardians, or court-appointed attorneys in the new cases will be dismissed based on the Eighth Circuit's opinion in *Myers,* 810 F.2d at 1465–68.

actions. Margaret Subby, former director of the Scott County HSD, is named in the *Bentz, Brown, Buchan, Germundson, Meger, Myers* and *Morgenson* actions. Mary Tafs, a child protection worker with the HSD, is named in the *Buchan, Germundson,* and *Meisinger* actions; Rachel Paff, a child protection worker with the HSD, in the *Lallak* action; Judy Dean, a child protection worker with the HSD, in the *Buchan* action; Karen Kandik, supervisor of the central intake unit for the Scott County HSD, in the *Germundson* action; and James Poulos, a child protection worker at the Scott County HSD, in the *Meisinger* action.

HSD involvement in the Scott County investigation dates to October 1983. At that time Kathleen Morris requested that social workers assist in the questioning of child victim-witnesses and accompany deputies when arrests were made to assist in the removal of children from the homes. Social workers occasionally signed neglect petitions which resulted in the initiation of neglect-dependency proceedings. Additionally, on at least some occasions social workers actively intervened in questioning of child victim-witnesses, either to reassure or comfort the child or to assist the interrogating officer in eliciting information from the child.

In general, plaintiffs allege that the social workers acted in derogation of their fourteenth amendment liberty interests, by causing or contributing to initial and continuing separation of parents from children; by failing to reunite families and failing to assist parents whose children had been taken from them; and by aiding law enforcement officers in the fabrication of false evidence and the deception of judicial officers. The social workers now move for summary judgment as to all claims against them.

### 1. Due Process

The fourteenth amendment provides that no state shall deprive any person of life, liberty or property without due process of law. U.S. CONST. Amend. XIV; *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983). It is undisputed that parents have a fundamental liberty interest in the care, custody, and management of their children. *Fitzgerald v. Williamson*, 787 F.2d 403, 407 (8th Cir.1986); *Ruffalo by Ruffalo v. Civiletti*, 702 F.2d 710, 715 (8th Cir.1983); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). This right is not absolute, however. Compelling public necessity can justify its termination if proper procedures are followed. *Ruffalo*, 702 F.2d at 715. In this case, plaintiffs claim that substantive and procedural due process as guaranteed by the fifth and fourteenth amendments has been denied them, due to state-sponsored disruption of the family unit. Because plaintiffs' due process claims against the social workers are without merit, summary judgment for defendants will be granted.

### (a) Substantive Due Process

■ The substantive component of the due process clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them ... [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), *quoting Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1856); *quoted in Fitzgerald*, 787 F.2d at 407. Because due process of law, as a "'historic and generative principle, precludes defining,' there are no precise standards for determining what governmental actions are proscribed by substantive due process." *Fitzgerald*, 787 F.2d at 408, *quoting Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952). "[D]ue process is not a technical conception with a fixed content unrelated to time, place and circumstances.... Rather, the phrase expresses the requirement of 'fundamental fairness'.... Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation." *Lassiter v. Depart-*

ment of Social Services of Durham County, North Carolina, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640 (1981). In determining whether a substantive right protected by the due process clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society." Youngberg v. Romeo, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982). In seeking this balance, the Court must weigh "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." Youngberg, 457 U.S. at 320, 102 S.Ct. at 2460.

The interests of the various plaintiffs in preserving and maintaining their family units are among the strongest recognized in law. "[A] parent's interest in the custody of his or her child is among the most basic and fundamental of the liberties protected by the Constitution." Davis v. Page, 618 F.2d 374, 379 (5th Cir.1980). The constitutional interest "in the development of parental and filial bonds free from government interference has many avatars.... [A]bove all, it is manifested in the reciprocal rights of parent and child to one another's 'companionship.'" Franz v. United States, 707 F.2d 582, 595, addendum at 712 F.2d 1428 (D.C.Cir.1983). As stated by the Eighth Circuit in Bohn v. County of Dakota, 772 F.2d 1433, 1435 (8th Cir.1985) cert. denied, 475 U.S. 1074, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986), "The privacy and autonomy of familial relationships ... are unarguably among the protectible interests which due process protects. We can conceive of no more important relationship, no more basic bond in American society, than the tie between parent and child." Bohn, 772 F.2d at 1435.

■■■ Balanced against the individual interest in the privacy and autonomy of familial relationships is the state's interest in the welfare and protection of children. "It cannot seriously be disputed that the state seeks to further a legitimate state interest when it sets out to protect the welfare of its citizens of tender age." Alsager v. District Court of Polk County, Iowa, 406 F.Supp. 10, 22 (S.D.Ia.1975),

aff'd, 545 F.2d 1137 (8th Cir.1976). The state has an "urgent interest" in the welfare of the child. Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159. Indeed, as the Supreme Court recognized in Stanley v. Illinois, 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972), the state has the "right" and the "duty" to protect minor children. Alsager, 406 F.Supp. at 22; Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). Of course, the fundamental liberty interest of natural parents in the care, custody, and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state. Santosky, 455 U.S. at 753, 102 S.Ct. at 1395. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky, 455 U.S. at 753, 102 S.Ct. at 1394. In balancing the interests of the individual and of the state, the contours of substantive due process "are ordinarily to be sought ... in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" Bohn, 772 F.2d at 1436, quoting Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977).

■■■ In this case, plaintiffs allege that the HSD and individual social workers contravened their rights to substantive due process by causing or contributing to the initial and continuing separation of children from their parents, developing allegedly false accusations of child sexual abuse against adult plaintiffs, failing to adhere to various state statutes and regulations in connection with child foster care, failing to properly investigate reports of child abuse, and failing to provide certain services to the parents and children. As to the plaintiffs' allegations that the social workers caused or contributed to the arrest of plaintiffs and the initial and continuing separation of parents from children, at this stage of the litigation, following full and fair discovery, it is now apparent that plaintiffs simply cannot prove that the social workers "caused" these alleged constitutional depri-

vations. As the Court noted in its 1985 *Memorandum and Order,* the sole role played by these defendants in the arrest of plaintiffs and removal of children from plaintiffs' homes was to participate in questioning of the children and to be on hand when children were removed from the home. The final decision to arrest, and the final decision to remove children from a particular home, were made by others. A section 1983 damages action is in essence a tort damages action. A plaintiff seeking tort damages cannot withstand summary judgment if he is unable to satisfy the essential elements of a tort cause of action, *i.e.,* causation and damages. *Lossman v. Pekarske,* 707 F.2d 288, 290 (7th Cir.1983). In order to succeed on their claims against the social workers, plaintiffs must allege and prove that the alleged denial of substantive due process was "a necessary condition, or 'but for' cause, of the separation of children [from their parents] on which the claim for damages is based." *Lossman,* 707 F.2d at 291. It must also be shown that the act was taken pursuant to the custom, *i.e.,* that the municipal custom was the "moving force" of the constitutional violation. *Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir.1987). Because the decision to arrest plaintiffs and to separate children from parents was made by others, with only very minimal input, if any at all, from the social workers, plaintiffs simply cannot satisfy this "but for" precondition.

■ Even if it is assumed that the HSD and social workers did play a role in deciding to arrest and separate, plaintiffs' allegations still do not rise to the level of a substantive due process deprivation. In striking the substantive due process balance, the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the [infringement] ... is such as to violate due process." *Youngberg,* 457 U.S. at 320, 102 S.Ct. at 246. It is a question of degree. In general, substantive due process "is concerned with violations of personal rights ... so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980); *citing Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). Among the rights given protection under the rubric of substantive due process is "the right to be free of state intrusions ... through means so brutal, demeaning, and harmful as literally to shock the conscience of a court." *Hall,* 621 F.2d at 613. Weighed in the balance against the state's "urgent" interest in the welfare of the children, the Court finds that plaintiffs' claims, taken as true for purposes of this summary judgment motion, simply do not rise to the level of justiciable substantive due process claims. The individual interests of the plaintiffs, although strong, are more than counterbalanced by the state's compelling interest. The social workers simply assisted law enforcement officials by taking part in questioning and tending to the details of child foster care placement.[2] Under the circum-

2. Indeed, social workers and the courts have recently been criticized for failing to act quickly when confronted with suspected child abuse. *See* "St. Paul boy died month after abuse probe," Minneapolis Star & Tribune, June 24, 1987, at 7B, col. 6:

A 15–month–old St. Paul boy who was beaten to death in February was the subject of a child abuse investigation a month earlier by Ramsey County child protection workers, according to newly released court records.

The victim['s] ... death on Feb. 22 was ruled a homicide, but no one has been charged....

The Ramsey County medical examiner's office ruled that [the child] died of peritonitis, an inflammation of the membrane lining the abdominal cavity, caused by a blunt injury of "tremendous force."

The medical examiner's office told police that the injury was inconsistent with a fall, which the parents said caused the injury.

The medical examiner also told police that [the child] suffered the fatal injury at least 24 hours before dying and that he would have been in extreme pain.

According to a search warrant affidavit filed Tuesday in Ramsey County District Court, a county child protection worker told police three days after [the child's] death that he and a co-worker had earlier investigated a vague report of child abuse involving the boy.

....

stances, the actions taken by social workers, although inarguably disruptive to the family units of the various plaintiffs, were motivated by compassion for the children and are in no way indicative of an "abuse of official power which shocks the conscience."

This conclusion is supported by the Eighth Circuit's decision in *Fitzgerald*. In *Fitzgerald* plaintiff brought suit against various defendants contending that they contravened her right to substantive due process by causing her relationship with her child to be terminated. The Eighth Circuit granted defendants' motion for summary judgment as to plaintiffs' substantive due process claim, finding that "defendants' conduct in this case does not rise to the level of a substantive due process violation." *Fitzgerald*, 787 F.2d at 408. The court explained its ruling in the following terms:

> Our conclusion follows from the fact that it does not shock our conscience or otherwise offend our judicial notions of fairness to hear that caseworkers responsible for an allegedly abused child arranged for the child to be examined by a psychologist and, after receiving confirmation of child abuse, reduced the parents' visitation rights and permitted the child to remain with her foster parent when the foster parent moved out of the parents' geographical area.

*Fitzgerald*, 787 F.2d at 408. Significantly, the court made this finding despite "tak[ing] as true" plaintiffs' allegations that the defendants "wanted to terminate the [plaintiffs'] relationship with their daughter and committed [the alleged acts]

with this goal in mind." *Fitzgerald*, 787 F.2d at 408.

In *Gibson v. Merced County Department of Human Services*, 799 F.2d 582 (9th Cir.1986), a foster child and her foster parents brought an action against a county agency which had caused the child to be removed from the foster home, alleging, *inter alia*, violation of the child's substantive due process rights based on social service officials' deliberate indifference to her serious medical needs. The Ninth Circuit granted summary judgment for the county as to plaintiffs' substantive due process claim, on the ground that plaintiffs had "failed to present any specific facts which would cast doubt on the Department's assertion and extensive supporting materials showing that they were acting in [the child's] best long term interests in removing her from the ... home." *Gibson*, 799 F.2d at 590. Because the removal decision could not "be said to be arbitrary" in light of all facts and circumstances of the case the court found plaintiffs' substantive due process claim to be without foundation. *Gibson*, 799 F.2d at 590. As stated by the court:

> As it turned out, the Department's decision to remove [the child] from the ... home was infelicitous. However, hindsight alone is not enough to establish a constitutional violation. We must examine the officials' actions in the context in which they occurred.... In this case, the steps taken by the Department were entirely reasonable in light of the circumstances....

*Gibson*, 799 F.2d at 590.

Viewing defendants' actions "in the context in which they occurred," it cannot be

---

[Police] said the investigation of [the child's] death has stalled because neither the parents nor potential witnesses to the beating have cooperated with police.

*See also* "Court protects adults, victim's mother says," St. Paul Pioneer Press-Dispatch, June 23, 1987, at 1A, Col. 4:

> State courts are too protective of adults in child abuse cases ... a House subcommittee [was told] Monday.
>
> ....
>
> "If a child is being abused, he should be removed from the home," [the witness] said in an interview following her appearance before the subcommittee. "How are they going

to give that child 24–hour protection? The child who is being abused doesn't have any rights and the system is showing us that every day."

While the Court's decision today is based on the facts and circumstances of the instant cases and not on extra-judicial matters, the Court will not blind itself to the fact that child protection workers are under pressure to act quickly to remove children from homes where abuse is suspected. Given this pressure, it would be anomalous indeed to hold that child protection workers who do act quickly are subject to suit for damages.

said that the decision to separate children from their parents in the instant cases was either arbitrary or unreasonable. Although removal of a child from his or her home is "inevitably traumatic," it is clear that defendants herein were motivated solely by sincere compassion for children reasonably suspected to be victims of abuse,[3] and that the disruption of plaintiffs' familial units, although in some cases "infelicitous," was undertaken with the long-term interests of the children firmly in view. "[H]indsight alone is not enough to establish a constitutional violation." *Gibson*, 799 F.2d at 590. Plaintiffs have not shown that defendants' conduct was "inspired by malice or sadism" or that it "amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Quite to the contrary, the Court's thorough review of the record leads it to conclude that although tainted in some respects by an "unwise excess of zeal" defendants' act of removing children reasonably suspected of being abused was reasonable and does not rise to the level of a substantive due process deprivation.

Further, defendants exercised professional judgment throughout the investigation. In *Youngberg* the Supreme Court suggested that the appropriate substantive due process balance may be struck by examining the conduct of state actors in light of "accepted professional judgment." *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462. *Youngberg* was a case concerning state treatment of involuntarily committed mentally retarded persons. In *Youngberg* plaintiff alleged that he had been denied his constitutional rights to safe conditions of confinement, freedom from bodily restraint, and rehabilitative training. In weighing plaintiff's substantive due process claims, the *Youngberg* Court assessed the reasonableness of defendants' conduct

in light of professional norms, ruling that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462. The Court reasoned:

> We think the standard ... affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the [individuals].... "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

*Youngberg*, 457 U.S. at 321, 102 S.Ct. at 2461, *quoting Romeo v. Youngberg*, 644 F.2d 147, 178 (3d Cir.1980) (Seltz, J., dissenting). The Court further added that "the decision, if made by a professional, is presumptively valid." *Youngberg*, 457 U.S. at 323, 102 S.Ct. at 2462 (footnote omitted).

Here, there is no evidence that the social workers departed from "accepted professional judgment, practice, or standards." Responding to a request by the county attorney, social workers attended child interviews, and when a decision to remove a child from a home had been made, social workers accompanied police officers and arranged for emergency care. This conduct on the part of the social workers is presumptively valid, and plaintiffs have not offered any proof which would rebut that presumption. The record supports a finding that the social workers cleaved to professional standards throughout the investigation[4]. Here, as in *Youngberg*, "there

---

**3.** Plaintiffs contend that the allegations of abuse on which defendants relied were untrustworthy, but as discussed more fully *infra*, plaintiffs have not shown that defendants knew the information to be untrustworthy at the time the separation decisions were made. Further, plaintiffs have not explained away the flood of indisputably trustworthy information on which defendants relied, such as physical evidence and corro-

borative adult admissions. Even assuming some of the child victim-witness accusations were unreliable, defendants had a great deal of indisputably trustworthy information on which they justifiably relied.

**4.** Plaintiffs claim defendants contravened their respective liberty interests by failing to reunite families once child victim-witness accusations had been shown to be without foundation.

certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Youngberg,* 457 U.S. at 323, 102 S.Ct. at 2462. In *Gibson* the United States Court of Appeals for the Ninth Circuit noted that "officials' actions" must be examined "in the context in which they occurred. Moreover, we must be mindful that 'courts must show deference to the judgment exercised by a qualified professional.'" *Gibson,* 799 F.2d at 590. Because the defendants did not depart from accepted professional judgment, practice or standards, plaintiffs' substantive due process claims against them will be dismissed.

### (b) Procedural Due Process

■ Plaintiffs also claim that they were denied procedural due process, in contravention of the fifth and fourteenth amendments. An individual is not entitled to constitutional protection under the due process clause unless that party can demonstrate that: (a) there has been a deprivation of liberty or property in the constitutional sense; and (b) the procedures used by the state to effect this deprivation were constitutionally inadequate. *Rivera v. Marcus,* 696 F.2d 1016, 1022 (2d Cir.1982). The procedural protections guaranteed by the fifth and fourteenth amendments "are triggered by the existence of a protectible liberty or property interest. Thus, the process that is due depends upon the nature of the interest at stake." *Bohn,* 772 F.2d at 1435. In resolving such issues, the Eighth Circuit in *Bohn* directed the courts to engage in a two-step analysis. First, the Court must determine whether plaintiffs have identified a protectible interest. Plaintiffs have surmounted that barrier in this matter, as discussed above. Second, the Court must "examine the established procedures to determine whether they satisfy constitutional standards." *Bohn,* 772 F.2d at 1435.

In determining the quantum of process due in a given context the courts have looked to the three factors specified in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

First, the private interest that will be affected by the initial action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burden that the additional or substitute procedural requirement would entail.

*See Bohn,* 772 F.2d at 1436.

■ The private interest at stake in these cases is the plaintiffs' interests in preservation of the respective familial units. These are potent interests entitled to great deference, as discussed above. The state's interest—that of protecting children reasonably suspected of being abused—is also of signal importance. Plaintiffs claim they were deprived of procedural due process in that their children were taken from them without notice and hearing. While acknowledging that plaintiffs' children were removed in a summary manner, defendants point out that plaintiffs were entitled to and did avail themselves of significant post-deprivation remedies, which *in toto* negate any constitutional harm of which plaintiffs complain. The Court concludes that defendants are correct, and that the post-deprivation remedies afforded plaintiffs were sufficient to satisfy procedural due process.

■ Procedural due process fundamentally requires that an aggrieved party be provided with an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews,* 424 U.S. at 333, 96 S.Ct. at 901; *Rivera,* 696 F.2d at 1027. In some circumstances, postdeprivation remedies provided by state law and regulations may be sufficient to satisfy the strictures of procedural due process, notwithstanding that the deprivation of liberty or property

Plaintiffs' claims are considerably undercut by the fact that many parents stipulated to initial and continued removal of children, as well as the fact that in certain cases (such as *Joe* and

*Meisinger*) examining professionals recommended that children not be returned to the homes.

took place without the benefit of notice and hearing. In a child removal context, post-deprivation remedies may be particularly appropriate. For example, in *Fitzgerald* plaintiffs claimed denial of procedural due process based on the state's act of terminating their parental relationship with their child. The state determined to place the child with a foster parent without the benefit of an administrative hearing and reduced the parents' visitation rights without obtaining prior juvenile court approval. While recognizing that plaintiffs had a liberty interest in the "care, custody, and management of their child," and that the state had failed to provide the plaintiffs with a hearing prior to reducing their visitation rights and prior to permitting the child to remain with her foster parent, the Eighth Circuit found that, because state law "provides adequate protection for the parental interests implicated by such decisions," plaintiffs' "procedural due process rights were not violated by the [State's] visitation and placement decisions." *Fitzgerald*, 787 F.2d at 408. The court's decision was based primarily on the fact that state law provided an adequate *postdeprivation* remedy, *i.e.*, the parents had the ongoing opportunity to "petition the juvenile court for modification of custody orders at any time." *Fitzgerald*, 787 F.2d at 408. Balancing the *Mathews v. Eldridge* factors, the court determined that this post-deprivation remedy was the quantum of process due the plaintiffs under the circumstances and that, accordingly, there was no constitutional deprivation.

Similarly, in *Bohn v. County of Dakota*, the Eighth Circuit found that plaintiffs had suffered no deprivation of procedural due process, notwithstanding that they had been "identified as suspected child abusers" without notice or hearing. The court found that "ex post procedures" available to plaintiffs were "fully adequate" to test the veracity of the county's finding. *Bohn*, 772 F.2d at 1438. The *Bohn* court, in an opinion written by Judge Heaney, reasoned that:

> Moreover, the *ex post* procedures for review are fully adequate to test the veracity of the County department's find-

ing in that these procedures substantially incorporate truth-testing measures long approved by our legal system. We note that *ex post* procedures have previously been approved by the courts in cases which bear comparison with the case at bar. Thus, the Second Circuit recently declared, "Where a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligation by providing the latter." *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir.1984), *cert. denied*, [469 U.S. 932], 105 S.Ct. 328, 83 L.Ed.2d 265 (1984). In cases which require fast action to protect the interests of children, *e.g., Duchesne v. Sugarman*, 566 F.2d 817, 826 (2d Cir.1977), or where an *ex ante* intervention by the state was based on a generally reliable *ex ante* finding, *see Barry v. Barchi*, 443 U.S. 55, 64–65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979), such procedures have been upheld.... In addition, we believe that the interjection of fuller procedural protections at an earlier state in the process would be unduly time-consuming and cumbersome, and might well reduce important protections which the state legislature designed for otherwise vulnerable children.

*Bohn*, 772 F.2d at 1438–39.

 In the context of suspected child abuse, the "fundamental interest of the parents ... and the possibility of an erroneous adjudication of dependency [or abuse] must be balanced against any interest that the state may have in conducting summary proceedings ... to protect the health and welfare of the child." *Davis*, 618 F.2d at 381. There is no denial of procedural due process if the state provides reasonable post-deprivation remedies for preventing families from being arbitrarily broken up by local officers. *Ellis v. Hamilton*, 669 F.2d 510, 515 (7th Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). Where the state has a procedure for a prompt, adversary postdeprivation hearing in a child custody matter and the hearing is held and establishes that the state officers acted prudently in remov-

ing the child from the parents' custody without a prior hearing, that finding extinguishes any claim that the failure to hold a pre-deprivation hearing was a denial of due process. *Lossman,* 707 F.2d at 292. In general, when a child's safety is threatened, that is "justification enough for action first and hearing afterward." *Lossman,* 707 F.2d at 291. As Judge Heaney stated most eloquently in *Bohn:*

Third, we consider the government's interests, including the burdens imposed by additional procedural protections. The government has a strong interest in protecting powerless children who have not attained their age of majority but may be subject to abuse or neglect. To the extent that pre-investigation procedural protection might delay or frustrate the protection of these children, we be-

lieve the government's interest might be impaired. In addition, although the pecuniary cost of such additional protection might not be great, to the extent that it would be duplicative of *ex post* procedures we have discussed at length, whatever cost would be entailed would be wasteful.

*Bohn,* 772 F.2d at 1439.

In sum, the Court finds that plaintiffs have suffered no deprivation of substantive or procedural due process. Accordingly, defendants' motion for summary judgment as to plaintiffs' substantive and procedural due process claims will be granted.

### 2. Qualified Immunity

The social workers also move for summary judgment on the basis of qualified immunity.[5] In *Harlow v. Fitzgerald,* 457

---

**5.** The social workers also claim absolute immunity. Section 1983 "on its face admits of no immunities." *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). Nevertheless, the Supreme Court has extended absolute immunity to governmental officials who perform judicial or quasi-judicial functions "intimately associated with" the judicial process. *Imbler,* 424 U.S. at 430, 96 S.Ct. at 994. Immunities recognized by the Supreme Court are of two types: those which existed at common law, *Owen v. City of Independence,* 445 U.S. 622, 637, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980); *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), and those based upon a test of "functional comparability." *Mazor v. Shelton,* 637 F.Supp. 330, 333 (N.D.Cal. 1986); *quoting Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978). In the latter case, the Supreme Court has "compared the functions of certain officials to the functions of analogous officials who enjoyed immunity under common law ... emphasiz[ing] that the nature of the official's function, not his or her status determines whether an official enjoys absolute or qualified immunity." *Mazor,* 637 F.Supp. at 334, *citing Imbler,* 424 U.S. at 423 n. 20, 96 S.Ct. at 991 n. 20; *Butz,* 438 U.S. at 511–12, 98 S.Ct. at 2913–14; *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 41 (1985); *Anderson v. Boyd,* 714 F.2d 906, 909 (9th Cir.1983).

In *Imbler* the Supreme Court granted absolute immunity to prosecutors acting within the scope of their prosecutorial duties. *Imbler,* 424 U.S. at 420, 96 S.Ct. at 990. In *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) the Court extended the rule of *Imbler* to provide absolute immunity for "agency officials performing certain functions analogous to those of a prosecutor." *Butz,* 438 U.S. at 515, 98 S.Ct. at

2915. In reliance on *Imbler* and *Butz,* a number of courts have extended absolute immunity to social workers, finding that "the role of a social worker in the care of minors is sufficiently analogous to the role of a prosecutor to warrant absolute immunity." *Mazor,* 637 F.Supp. at 334. *See, e.g., Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984); *Meyers v. Contra Costa County Department of Social Services,* 812 F.2d 1154 (9th Cir.1987); *Hennessey v. State of Washington, Department of Social and Health Services,* 627 F.Supp. 137 (E.D.Wash.1985); *Pepper v. Alexander,* 599 F.Supp. 523 (D.N.Mex.1984); *Whelehan v. County of Monroe,* 558 F.Supp. 1093 (W.D.N.Y.1983); *Malachowski v. City of Keene,* 787 F.2d 704 (1st Cir.1986) (juvenile officer who initiates juvenile delinquency proceeding). These courts have reasoned that, like prosecutors, social workers are required to collect and analyze investigative information, and based upon that information, determine whether to initiate court proceedings on behalf of a child suspected to be a victim of neglect and/or abuse. In addition, like prosecutors, social workers must "make decisions about the temporary or protective custody of minors ... often ... on an emergency basis." *Mazor,* 637 F.Supp. 334. As with prosecutors, social workers are a ready target for disgruntled private parties. "The social workers' independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit." *Meyers v. Contra Costa County Department of Social Services,* 812 F.2d at 1157. Because plaintiffs have suffered no constitutional deprivation at the hands of social workers in the instant cases, and because the social workers are entitled to qualified immunity in any event, it is unnecessary to reach the absolute

U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The doctrine of qualified immunity involves a delicate balancing of the rights of citizens to obtain redress for wrongs committed by public officials and the need to assure that public officials will perform their assigned duties unfettered by the prospect of being subjected to the costs of defense and the consequences of a damages award for acts done in the course of official duties. *Allred v. Svarczkopf,* 573 F.2d 1146 (10th Cir.1978). Qualified immunity exists to protect public officers from liability for the exercise of discretion in performing a public duty; it reflects a decision that the public is better served by public officials who will not be deterred by fear of liability from executing the office with an independent and decisive judgment. *Fowler v. Cross,* 635 F.2d 476 (5th Cir. 1981). In order to determine the scope of the qualified immunity defense in a given context, the Court must "focus on the specific nature of the conduct complained of and the state of the law with respect to the identified conduct at the time the official acted." *Myers,* 810 F.2d at 1459 n. 16. "In order to determine whether a defendant has violated a plaintiff's clearly established rights, [it is] necessary to make two inquiries ... (1) which particular act or omission of the defendant violated the plaintiff's federal rights, and (2) whether governing case or statutory law would have given a reasonable official cause to know, at the time of the relevant events, that those acts or omissions violated the plaintiff's rights." *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (Brennan, J., concurring in part and dissenting in part), *cited in Myers,* 810 F.2d at 1459 n. 16.

Here, plaintiffs have identified a number of *particular* acts or omissions which they allege to have violated their "clearly established rights": interrogation of children for an improper purpose and an improper manner; causing or contributing to the initial and continuing separation of children from parents; and developing accusations against the adult plaintiffs in reckless disregard of the truth. Plaintiffs further allege that the HSD defendants contravened various state statutes and regulations in their handling of these matters. Defendants convincingly argue that even accepting that defendants are guilty of some or all of these acts and/or omissions, qualified immunity protects them from a civil suit for damages, in that the rights allegedly contravened were not "clearly established." The Court finds defendants' arguments to be the more persuasive.

■ With respect to allegations that the social workers improperly questioned child witnesses, "[i]mmunity is forfeited for the questioning function upon at least a preliminary showing that the interrogation so exceeded clearly established legal norms for this function that reasonable persons in the [social workers'] position would have known their conduct was illegal." *Myers,* 810 F.2d at 1460, *citing Kompare v. Stein,* 801 F.2d 883, 887 (7th Cir.1986). In *Myers* the Eighth Circuit found that because the "standards for the interrogation of juvenile witnesses and victims, particularly in the area of sexual abuse" were not clearly established in 1984, deputy sheriffs who participated in the questioning were protected by qualified immunity. *Myers,* 810 F.2d at 1461. This reasoning applies with even greater force to the social workers, whose role in the questioning was peripheral at best. The social workers are protected by qualified immunity from allegations that they improperly questioned child witnesses.

With respect to allegations that the social workers caused or contributed to initial and continued separation of children from

immunity issue and the Court neither approves nor disapproves those cases holding social workers absolutely immune.

parents (and completely apart from the fact plaintiffs cannot establish "but for" causation, since the removal decision was made by others), as stated by the Eighth Circuit in *Myers*, "[t]he issue for immunity purposes ... is whether the members of the plaintiffs' family units had a clearly established right to remain together prior to any initiation of charges of intrafamilial abuse." *Myers*, 810 F.2d at 1461–62. If there was a "legitimate question" as to the legality of summarily separating children from parents then damages claims against the social workers based on such conduct are barred by qualified immunity. *Myers*, 810 F.2d at 1462. In *Myers*, the Eighth Circuit expressly concluded that, because the parameters of plaintiffs' liberty interest in maintenance of the family unit are ascertainable only by balancing the interests of the parents and children against those of the state, the right allegedly infringed by defendants was not "clearly established." As stated by the court:

> In our view, the parental liberty interest in keeping the family unit intact is not a clearly established right in the context of reasonable suspicion that parents may be abusing children. If law enforcement personnel who have at least arguable probable cause to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established on this point. There is certainly no available legal precedent to this effect.

*Myers*, 810 F.2d at 1463.

 This reasoning is fully applicable to the social workers, whose role in initiating child removal was peripheral at best. The social workers are protected by principles of qualified immunity from allegations that they contravened plaintiffs' liberty interests by causing or contributing to the initial and continuing separation of children from parents.

 Plaintiffs also allege that the social workers aided and abetted police officers in fabricating evidence against them and deceiving judicial officers with false and unreliable representations of alleged child sexual abuse. A similar claim was made against the deputies in the *Myers* appeal. The Eighth Circuit found that while qualified immunity does not protect state actors who deliberately mislead judicial officers, "a substantial preliminary showing of dishonesty is necessary to obtain even an evidentiary hearing in an attempt to impeach a warrant application which on its face reveals probable cause." *Myers*, 810 F.2d at 1457. After a thorough review of the claims made against the deputies, the court concluded that plaintiffs had "not even approached" the level of specificity required to defeat qualified immunity, in light of the fact that "[n]o facts have been recited which would indicate that any of the deputies actually believed the plaintiffs were innocent or the children were lying when the deputies acted on the children's statements." *Myers*, 810 F.2d at 1458. Plaintiffs' "conclusory" allegations were found to be insufficient in the absence of a "specific affirmative showing of dishonesty" on the part of the deputies. *Myers*, 810 F.2d at 1458. Plaintiffs' claims of social worker evidence fabrication and duplicity are even less specific than the claims made by them against the deputies in *Myers*. Plaintiffs have offered only conclusory allegations unsupported by any specific affirmative showing of dishonesty. Plaintiffs have not and cannot show that any of the social workers actually believed the plaintiffs were innocent or that the children were lying when they participated in the arrest of plaintiffs and initiated placement of children in foster care. Under the circumstances, the reasoning and conclusion of the Eighth Circuit in *Myers* is fully dispositive of plaintiffs' claims against the social workers. In the absence of a specific showing of dishonesty, the social workers are protected by qualified immunity from allegations that they fabricated evidence and deceived judicial officers.

 Finally, plaintiffs point to various state statutes and regulations which the social workers allegedly contravened in handling the Scott County investigation. Specifically, plaintiffs claim that the social

workers violated Minn.Stat. §§ 626.556, subd. 10(a); 260.165, subd. 1(c)(2); 13.04, subd. 2; 257.071; as well as Minnesota Rules §§ 9560.025–9560.0500 and 42 U.S.C. §§ 671(a)(15), 672(a)(1), and 675. As noted in *Myers*, "a violation of state law is neither cognizable under section 1983 nor results in forfeiture of immunity for the alleged violations of rights which have independent constitutional origin" unless "the rights which form the basis of plaintiffs' civil rights claims were conferred by state law." *Myers*, 810 F.2d at 1469, *citing Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). "[Q]ualified immunity will be forfeited only when at the time of the conduct in question it is clearly established that plaintiffs have the particular constitutional right and that the statutory and regulatory provisions in question bear upon or implicate that right." *Culbreath v. Block*, 799 F.2d 1248, 1250 (8th Cir.1986). Here, as in the cases disposed of in *Myers*, the rights asserted by plaintiffs are all of federal constitutional origin, such as the fourth amendment right to be free from arrest without probable cause, the liberty interest in the family unit and fair trial, due process rights. Here, as in *Myers*, "[n]one of these interests is conferred by Minnesota legislation." *Myers*, 810 F.2d at 1469. At most these statutes and regulations establish "guidelines to be followed as a matter of state law and neither confers nor embodies any constitutionally-protected right asserted by the plaintiffs." *Myers*, 810 F.2d at 1469. As to Minn.Stat. § 626.556, subd. 10(a), in *Myers* the court determined that "the statute is not the source of the liberty interest in the family unit which the plaintiffs have sued to vindicate." *Myers*, 810 F.2d at 1469. As to Minn.Stat. § 260.165, subd. 1(c)(2), in

*Myers* the court found that any violation of this statute "would not bear upon nor defeat immunity for the constitutional claim." *Myers*, 810 F.2d at 1470. As to Minn.Stat. § 257.071 and 42 U.S.C. § 672–75, these statutes specify certain procedures relative to foster care placement of children, but do not bear upon plaintiffs' claimed liberty interest. Nor can plaintiffs show "but for" causation, inasmuch as even had defendants adhered to these requirements there was no guarantee that families would have been reunited. The Minnesota Rules relied upon by plaintiffs are similarly unconnected to plaintiffs' federal law claims, and plaintiffs appear to have waived these requirements in any event. Finally, as to Minn.Stat. § 13.04, subd. 2 ("Tennessen" warning), plaintiffs have not claimed that their liberty interests in undisrupted family units derives from this statute, nor have plaintiffs made a threshold showing that defendants in fact violated the statute. The social workers' participation in child victim-witness questioning was peripheral at best. In sum, because none of the state law statutes or regulations allegedly violated by defendants confer or embody any of the constitutionally-protected rights claimed, plaintiffs' state law arguments are unavailing.[6]

In sum, the social workers' motion for summary judgment will be in all respects granted. Plaintiffs have not made out a justiciable substantive or procedural due process claim. Plaintiffs cannot show "but for" causation as to their claims that the social workers caused arrests or caused children to be separated from parents. The social workers are qualifiedly immune from claims that they improperly questioned children or deceived judicial officers.

---

6. Plaintiffs' allegations that social workers contravened various state and federal regulations by failing to take steps to reunite separated families also fails in view of the fact that social workers relied upon the advice of HSD legal counsel in pursuing this alleged course of conduct. To the extent that the social workers relied in good faith upon the advice of competent counsel on a question of law of sufficient complexity to justify resort to expert legal guidance the social workers are protected by principles of qualified immunity for conduct undertaken in reliance upon such advice, provided that the advice was not patently unreasonable under the circumstances of the case. *Adler v. Lynch*, 415 F.Supp. 705, 714 (D.Neb.1976); *Wells v. Dallas Independent School District*, 576 F.Supp. 497, 508 (N.D.Tex.1983). HSD counsel advised the social workers that reunification of the separated families was not permissible, and the social workers relied in good faith on this advice. As such, the social workers are protected by principles of qualified immunity.

## B. Deputies

Scott County deputy sheriffs Michael Busch, Patrick Morgan, David Einertson and Norman Pint are named as defendants in the *Meisinger, Germundson* and *Morgenson* actions. Plaintiffs allege that the deputies sought arrest warrants, swore out criminal complaints, and effectuated arrest without probable cause; deceived judicial officers who found probable cause; interrogated children for an improper purpose and in an improper manner; and unconstitutionally removed minor children from their homes pursuant to police holds. Essentially the same claims were made against these deputies in the first *Myers* appeal. Defendants now move for summary judgment as to all claims against them on the basis of qualified immunity. The Court finds that all claims against the deputies are barred by principles of qualified immunity, and accordingly defendants' motions for summary judgment will be granted.

### 1. Arrest

As to plaintiffs' claims of unlawful arrest, in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), a case decided after this Court's 1985 decision but before the Eighth Circuit's *Myers* decision, the Supreme Court held that in the absence of proof that an arresting officer fabricated false evidence or otherwise deceived a judicial officer in connection with the procurement of an arrest warrant, the doctrine of qualified immunity bars any claim against the officer based on claims that he procured the arrest of the plaintiff without probable cause, provided that a reasonably competent and well-trained police officer would have believed that probable cause existed under the facts then known to the arresting officer. As interpreted by the Eighth Circuit in *Myers, Malley* stands for the proposition that "an officer requesting an arrest warrant will be shielded by qualified immunity for that function unless adjudged on an objective basis, 'no officer of reasonable competence would have requested the warrant.' ... 'Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the

shield of immunity be lost.' " *Myers,* 810 F.2d at 1455. Furthermore, "if officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley,* 106 S.Ct. at 1096, *quoted in Myers,* 810 F.2d at 1455. In determining whether immunity obtains, the Court's function is to "review the information before the deputy sheriffs when they swore out criminal complaints and performed arrests to determine whether no reasonably competent officer would have sought to arrest the ... plaintiffs on the basis of the known facts and circumstances." *Myers,* 810 F.2d at 1455.

A review of the information before the deputies when they swore out complaints and arrested Judy Kath, Scott and Marlene Germundson, Terry Morgenson, and Irene Meisinger reveals that the deputies were reasonable in believing that probable cause to arrest existed based on the facts then known. On the date of Irene Meisinger's arrest (November 30, 1983), the deputies had the following information: V. Kath's statement that Meisinger and James Rud had performed oral sex on each other and on her and J.M. Meisinger on one occasion; S. Krahl's description of activities at the home of Alvin and Rosemary Rud involving several adults, including Irene Meisinger, performing sexual acts upon and with children; and J.R.H. Meisinger's statement that Irene Meisinger had performed oral sex upon him, and that his stepfather, Gary Pautsch, had physically abused him over an extended period of time with Irene Meisinger's knowledge and consent. On the date of Marlene Germundson's arrest (November 10, 1983) the deputies had the following information: statements by the Germundson children that James Rud had sexually abused them in the presence of Marlene Germundson; physical evidence which corroborated the children's statements, *i.e.,* a physical examination of the five-year-old children which revealed that they had been sexually penetrated; Marlene Germundson's admission in a November 10, 1983 interview that she had knowledge of nude photographs of her children taken by James Rud and that she was been present

at Rud's residence on occasion when she "assumed" that Rud was engaged in sexual activity with her children, and her admission that her children had revealed to her in April or May 1983 that Rud had sexually abused them. On the date of Scott Germundson's arrest (February 27, 1984) the deputies had the following information: J. Olson's statement that on several occasions Scott Germundson had anally penetrated him; and C. Lebens' description of acts of sexual abuse upon and with children by Marlene and Scott Germundson at the James Rud residence. On the date of Judy Kath's arrest (November 14, 1983) deputies had the following information: V. Kath's description of sexual activities involving children and adults, including Judy Kath, at the Rud residence; Marlene Germundson's statements implicating Judy Kath in criminal sexual conduct at the Rud residence, which confirmed in part the statements made by V. Kath.

 In the light of information before the deputies when they swore out criminal complaints against those plaintiffs, the Court finds that the deputies' conduct was objectively reasonable. This is not an instance where "no officer of reasonable competence would have requested" the respective warrants. To the contrary, each criminal complaint and warrant was supported by detailed descriptions of criminal activity by suspected victim-eyewitnesses whose names and ages were known to the deputies and which were provided to judicial officers who also found probable cause. Each arrest was based on more than one accusation, and in the case of Judy Kath, a child's accusation were partially corroborated by statements of an adult (Marlene Germundson). In the case of Marlene Germundson, statements made by her children and others were partially confirmed by physical evidence. As to the suggestion that the age and particular vulnerabilities of young children made their accusations unreliable, here, as in the first *Myers* appeal, the Court is obliged to "reject the inference that law enforcement personnel are necessarily less entitled to rely on details of criminal activity described by children than those described by adults." *Myers*, 810 F.2d at 1456–57. A thorough review of the facts and circumstances known to police officers at the time of the arrests leads to the conclusion that the deputies' conduct in seeking and performing the arrests was objectively reasonable,[7] and that, at the very least, officers of reasonable competence could have differed as to probable cause. As such, the deputies are protected by principles of qualified immunity from plaintiffs' claims of unlawful arrest.

### 2. Deception of Judicial Officers

Plaintiffs also claim that the deputies perpetrated a fraud upon the judicial offi-

---

7. Other information known to officers during this time period and on which they justifiably relied in believing that child victim-witness sexual abuse allegations were not without substance include: T. Rud's statement that he had sexually penetrated J.M. Meisinger, a statement later confirmed by J.M. Meisinger; J.M. Meisinger's statement that her mother threw things at her and otherwise physically assaulted her; J.M. Meisinger's statement that she had observed James Rud sexually abusing V. Kath and Judy Kath taking pictures of children in the nude; J.M. Meisinger's statement that James Rud had sexually abused her in the presence of V. Kath; J.R.H. Meisinger's statement that he had seen Irene Meisinger sexually abuse J.M. Meisinger; Robert Kath's statement that he had seen Judy Kath and Coralene Rawson sexually abusing V. Kath and S. Rawson with candles and a miniature bowling pin (an allegation corroborated by a subsequent physical examination of candles and a bowling pin found at the Kath residence); M. Germundson's statement that James Rud had sexually abused her; C. Lebens' statement that James Rud had sexually abused her and that she had seen Rud abuse S. Germundson and M. Germundson; M. Germundson's statement that her mother did not act and refused to believe her when told of abuse by Rud; Marlene Germundson's statement that James Rud had threatened her not to go to the police with information pertaining to Rud's abuse of the Germundson children, V. Kath, and C. Lebens of which Marlene Germundson had knowledge. As the foregoing makes clear, this is not a case where officers acted prematurely in reliance on a small quantum of evidence. Faced with this flood of information, including detailed descriptions by child victim-witnesses of sexual abuse corroborated in whole or in part by physical evidence and/or adult statements, the officers were justified in relying on accusations made in individual cases.

cers who found probable cause by representing to judicial officers that child statements were reliable and by concealing allegedly exculpatory evidence. Allegations of judicial deception are sufficient to defeat qualified immunity if "the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth." *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir.1985). In order to impeach a warrant application which on its face reveals probable cause, "a substantial preliminary showing of dishonesty is necessary." *Myers*, 810 F.2d at 1457. In order to surmount this threshold barrier, plaintiffs must identify specific facts which "indicate that ... the deputies actually believed the plaintiffs were innocent or the children were lying when the deputies acted on the children's statements." *Myers*, 810 F.2d at 1458.

█ Here, as in *Myers*, plaintiffs "have not even approached" the requisite standard of specificity. Aside from conclusory allegations, plaintiffs have made no showing that the deputies believed the plaintiffs to be innocent or believed the children to be lying, or that the deputies presented information to judicial officers which they knew to be false or would have known to be false had they not recklessly disregarded the truth. To the contrary, in light of the many detailed, specific statements made by children and adults, many of which were corroborated by statements of others and/or by physical evidence, the deputies were fully justified in concluding that the information presented by them to judicial officers was bona fide. Any claim that the deputies would not have believed the children's statements but for flawed interroga-

tion and inadequate investigation must fail in the absence of a "specific affirmative showing of dishonesty by the applicant." *Myers*, 810 F.2d at 1458, *citing Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). Plaintiffs have failed to make a preliminary showing [8] adequate to overcome the presumed validity of warrant applications which on their face contained information that competent officers could reasonably believe amounted to probable cause. Thus, qualified immunity protects the deputies from plaintiffs' claims that they deceived judicial officers.

### 3. Questioning Children

Plaintiffs claim that the deputies interrogated children for an improper purpose and in an improper manner. Defendants claim they are qualifiedly immune from such claims. As discussed above, the deputies are shielded from liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In the context of child interrogation, the relevant inquiry is whether the specific interrogation conduct identified in the record "so exceeded accepted legal norms for the questioning of witnesses and victims that the interrogating detectives knew or should have known their conduct would violate the rights of accused persons." *Myers*, 810 F.2d at 1458. If, from a 1984 perspective, it was not "clearly established" that the conduct in which the deputies engaged contravened plaintiffs' fourth, fifth, sixth and fourteenth amendment rights, the deputies are

---

**8.** Even accepting plaintiff's claims that the deputies may have in isolated cases advertently or inadvertently failed to make known to judicial officers certain exculpatory evidence, plaintiffs still have not made the threshold showing necessitated by *Myers*—proof that "the deputies actually believed the plaintiffs were innocent or the children were lying when the deputies acted on the children's statements." *Myers*, 810 F.2d at 1458. The mere fact that the deputies may have failed to make known certain exculpatory evidence, while not to be condoned, does not, without more, give rise to an inference that the

deputies actually believed the children to be lying or plaintiffs to be innocent. It is at least as probable, in fact more so, that the deputies' alleged failure to fully divulge was a product of error, mistake, and/or a certain degree of investigative sloppiness, rather than a malicious purpose to prosecute persons whom the deputies believed to be innocent. Plaintiffs have succeeded in establishing that the deputies were not infallible; they have not succeeded in establishing that deputy errors rise to the level of constitutional deprivations.

immune from suit based on alleged improper questioning. *Myers*, 810 F.2d at 1458–59.

■ In *Myers* the Eighth Circuit concluded that deputy interrogation of child witnesses-victims "occurred in a grey area" to which there were, and probably still are, "less than clearly established legal norms." *Myers*, 810 F.2d at 1461. Because the standards for the interrogation of juvenile witnesses and victims were not clearly established in 1984, the deputies were adjudged to be qualifiedly immune from suit. The Eighth Circuit's ruling in *Myers* is fully dispositive of plaintiffs' claims in the instant case. Because the law was not clearly established in 1984, it matters not that the record allegedly reveals examples of investigative mistakes and flawed interrogation. In the absence of clearly established standards, the deputies will not now be forced, on the basis of hindsight, to defend their questioning techniques. "Immunity is forfeited for the questioning function upon at least a preliminary showing that the interrogation so exceeded clearly established legal norms ... that reasonable persons ... would have known their conduct was illegal." *Myers*, 810 F.2d at 1460, *citing Kompare*, 801 F.2d at 887. Here, in the absence of clearly-established standards, plaintiffs have not made, and cannot make, the requisite preliminary showing. The deputies are protected by principles of qualified immunity from plaintiffs' claims of improper child questioning.

### 4. Separation of Parents from Children

Plaintiffs also claim that the deputies caused or contributed to initial and continued separation of children from their parents. Plaintiffs' claims derive from their claimed liberty interest in maintenance of the family unit. In *Myers* the Eighth Circuit concluded that because the depth and breadth of plaintiffs' liberty interest in familial relations is measurable only by resort to a balancing of private and state interests, the claimed "parental liberty interest in keeping the family unit intact is not a clearly established right in the con-

text of reasonable suspicion that parents may be abusing children." *Myers*, 810 F.2d at 1463. The Eighth Circuit held:

> If law enforcement personnel who have at least arguable probable cause to believe that adults have been molesting children are not entitled to reasonable belief that the adults may pose a danger to their own children, then the law was (and is) not clearly established on this point. There is certainly no available legal precedent to this effect.

*Myers*, 810 F.2d at 1463.

■ Here, the deputies had at least arguable probable cause to believe that the instant plaintiffs had been molesting children, as discussed above. Plaintiffs were implicated in abuse of their own (with the exception of Morgenson) and other children. Under the circumstances, the deputies were reasonable in believing that the children may have been in danger. As noted by the *Myers* panel, Minn.Stat. § 260.165 1(c)(2), upon which the deputies relied in removing children from their homes, "reflects a legislative policy in favor of vigorous and immediate child protective endeavors." *Myers*, 810 F.2d at 1463. Because there was, at a minimum, a legitimate question concerning the legality of removing minor children from the custody of parents arrested for suspected child abuse, here, as in *Myers*, the deputies are protected by qualified immunity from any claim that they improperly separated parents from children.

In sum, because the deputies are protected by qualified immunities from plaintiffs' claims regarding arrest, questioning, and parent-child separation, and because plaintiffs have not made a threshold showing of deputy dishonesty with respect to their claim that deputies deceived judicial officers, the deputies are entitled to summary judgment as to all claims against them.

### C. Sheriff Tietz

Scott County Sheriff Douglas Tietz is named as a defendant in the *Germundson*, *Meisinger* and *Morgenson* actions. Here, as in the first *Myers* appeal, plaintiffs do not claim that Tietz personally participated

in the allegedly unconstitutional conduct, but rather claim that Tietz failed to intercede to prevent abuses by Morris and the deputies and failed to properly train and supervise his deputies.

 It is well established that a sheriff or supervisory officer cannot be held liable on a theory of *respondeat superior, Myers*, 810 F.2d at 1464; *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Nor does liability attach for mere failure to prevent misconduct on the part of a deputy, absent a showing of direct responsibility for the improper conduct. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Clay v. Conlee*, 815 F.2d 1164 (8th Cir.1987). In *Myers* the Eighth Circuit concluded that plaintiffs' claims of negligent failure to train or supervise were fatally deficient in view of the Court's finding that the deputies' conduct in procuring and making arrests was objectively reasonable and that the deputies violated no clearly established constitutional standards in interviewing witnesses and suspected victims and in removing children from the plaintiffs' homes. *Myers*, 810 F.2d at 1464. Further, allegations that the sheriff deprived plaintiffs of procedural or substantive due process through negligent or grossly negligent conduct does not state a claim under section 1983. *Myers*, 810 F.2d at 1468, *citing Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Plaintiffs have not shown and cannot show that the sheriff's alleged failure to train or supervise "was intentionally or knowingly committed with the purpose of injuring [plaintiffs], or that it was the result of an affirmative practice, custom, or policy instituted by the Sheriff." *Lozano v. Smith*, 718 F.2d 756, 769 (5th Cir.1983).[9] As to plaintiffs' claims that Tietz failed to intervene to prevent or remedy abuses committed by Morris, these amount at most to a claim that Tietz negligently failed to defend his office against encroachment by the prosecutor, a claim not federally cognizable. *Myers*, 810 F.2d at 1465.

The motion of Sheriff Tietz for summary judgment will be granted.

## D. Prosecutor

All of the instant plaintiffs have named former Scott County Attorney R. Kathleen Morris as a defendant. Morris' involvement in these matters dates to the arrest and subsequent conviction of James Rud. In the course of the investigation, Morris prepared and signed criminal complaints as to the plaintiffs who were arrested; reviewed, approved and signed neglect petitions; made court appearances; contacted law enforcement personnel regarding new information in previously charged criminal cases; occasionally met and interviewed child witnesses; and prosecuted the Bentzes in August–September 1984. Plaintiffs' claims against Morris in the instant cases essentially mirror the claims made against her in *Myers*. In general, plaintiffs allege that Morris abused the power of her office in the manner in which she initiated or threatened prosecution, handled evidentiary materials, and otherwise conducted matters preliminary to and encompassed within the investigation; erroneously advised law enforcement personnel that probable cause existed to arrest various plaintiffs; interrogated children for an improper purpose and in an improper manner; approved summary removal of children from their homes and initiated neglect petitions as to these children in derogation of plaintiffs' constitutional liberties; fabricated evidence and presented false evidence to the family court; and withheld potentially exculpatory evidence and destroyed items of evidence.

In *Myers* the Eighth Circuit found that Morris was absolutely or qualifiedly immune from suit as to all claims made against her. Because the Eighth circuit's ruling in *Myers* is fully dispositive of all claims made against Morris in the instant cases, Morris' motion for summary judgment will be granted.

Plaintiffs claim Morris abused the power of her office in the manner in which she

9. This point is discussed in greater depth, *infra*.

initiated prosecution. In *Myers* the court found that a prosecutor's "decision to file charges is protected, even in the face of accusations of: vindictive prosecution ... or reckless prosecution without adequate investigation ... or conspiracy to prosecute for a crime that never occurred ... [or] threatening criminal prosecution." *Myers,* 810 F.2d at 1446 (citations omitted). Plaintiffs claim Morris unconstitutionally initiated neglect-dependency proceedings; however, in *Myers* the Eighth Circuit found that among the acts encompassed within the protected function of initiating a case is the initiation of parental rights termination proceedings, even if done without notice to the parent. *Myers,* 810 F.2d at 1446. Plaintiffs claim Morris presented false evidence to judicial officers. In *Myers* the Eighth Circuit ruled that "allegations that a prosecutor knowingly offered, used or presented false, misleading or perjured testimony ... do not defeat absolute prosecutorial immunity," *Myers,* 810 F.2d at 1446, and that allegations of withholding or suppressing exculpatory evidence are also protected. As for the alleged destruction of evidence, the *Myers* court determined that the subject evidence was without constitutional significance and that nothing linked Morris to the destruction of evidence in any event. *Myers,* 810 F.2d at 1448.

As to plaintiffs' claims that Morris improperly caused their arrest, it is now clear that Morris had "no direct role in procuring or executing arrest warrants or performing warrantless arrests" and that "in providing advice to law enforcement officials concerning the existence of probable cause the prospective legality of arrests, Morris was functioning in a quasi-judicial capacity as a prosecutor initiating the formal judicial process." *Myers,* 810 F.2d at 1448. Morris is also "absolutely immune from having to defend her role in the interviewing of children," inasmuch as her involvement in child interrogation "was an integral part of her advocatory functions, *i.e.,* her ongoing

prosecutorial responsibilities to decide whom to charge and to prepare for the presentation of her cases." *Myers,* 810 F.2d at 1451. Finally, as to plaintiffs' claims that Morris impermissibly caused children to be separated from parents, the *Myers* court held that "a county attorney [is] absolutely immune for the function of initiating juvenile dependency and neglect proceedings." *Myers,* 810 F.2d at 1452.

In sum, all of the claims raised by plaintiffs against Morris in the instant suits were dispositively dealt with in *Myers.* In view of the Eighth Circuit's teachings on absolute prosecutorial immunity, the Court is constrained to find that Morris is immune from all claims raised against her in these matters. For this reason, Morris' motion for summary judgment will be granted.

### E. Scott County [10]

#### 1. Monell

■■■■ In *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the Supreme Court held that local governmental units could be made liable under section 1983 for deprivations of federal rights, overruling *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In so doing, the Court recognized that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. A governmental entity cannot be made liable by application of the doctrine of respondeat superior, *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036, or vicarious liability, *Monell,* 436 U.S. at 692–94, 98 S.Ct. at 2036–38. A city or other governmental entity may be held accountable only if the alleged constitutional deprivation was the result of municipal

**10.** Because the HSD is a non-legal entity which has no legal status apart from its status as a department of Scott County, it will be considered in this memorandum as synonymous with Scott County. Moreover, it would appear that due to its status as a non-legal entity, HSD is not amenable to suit in any event. *See* discussion *supra.* Further, because the *Brown, Bentz* and *Meger* complaints are completely devoid of allegations that the HSD promulgated unconstitutional policies or customs, the HSD must be dismissed as a defendant in those cases.

"custom or policy," [11] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985), or took place pursuant to the instructions of a final or authorized decision maker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). The municipal policy must be "the moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Tuttle*, 105 S.Ct. at 2434. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 106 S.Ct. at 1298. "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Tuttle*, 105 S.Ct. at 2436. That is, the entity's official "policy or custom" must have "caused" the constitutional violation alleged. *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir.1987), *citing Tuttle*, 471 U.S. at 823–24, 105 S.Ct. at 2436–37; *Pembaur*, 106 S.Ct. at 1292. The "causal connection" requirement was "intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers." *Tuttle*, 105 S.Ct. at 2435.

■ In a case where plaintiff seeks to hold a municipality or other governmental entity answerable in damages under *Monell*, the Court is obliged to undertake a two-step analysis. The first task is to identify what the governmental body's policy is. The second task is to determine whether that policy is unconstitutional. *Dick v. Watonwan County*, 738 F.2d 939, 943 (8th Cir.1984). Otherwise put, plaintiffs must first establish that they have been deprived of a constitutional right or rights, and then must establish that the governmental entity was the "person" who caused plaintiffs to be subjected to the deprivation. *Tuttle*,

105 S.Ct. at 2433. The mere fact that plaintiffs have alleged deprivations of constitutional guarantees will not suffice if in fact the entity's policy is not unconstitutional or if in fact the entity's policy did not cause the deprivation. *Dodson*, 454 U.S. at 326, 102 S.Ct. at 454 (municipality not subject to section 1983 liability where the policy identified by plaintiff as causing his deprivation did not violate the Constitution). As stated in *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir.1985):

> *Monell* instructs that, for a municipality to be held liable under § 1983, a plaintiff must show that the action alleged to be unconstitutional implements a county policy or was invoked pursuant to a governmental custom, *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36, and that the official policy was the "moving force" behind the violation. *Id.* at 694, 98 S.Ct. at 2037; *cf. Rizzo v. Goode*, 423 U.S. 362, 370–77, 96 S.Ct. 598, 603–07, 46 L.Ed.2d 561 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under § 1983). Moreover, the plaintiff must show not only that a policy or custom existed, and that it was causally related to the plaintiff's injury, but that the policy itself was unconstitutional.

**(a) Specificity**

■ As a preliminary matter, defendants point out that plaintiffs have failed to allege unconstitutional customs or policies with specificity. Under *Monell*, liability of a governmental entity lies only where plaintiff in his complaint alleges a specific unconstitutional policy or custom. *Move Organization v. City of Philadelphia*, 530 F.Supp. 764, 765 (E.D.Pa.1982). This is in keeping with the general principle that "plaintiffs in civil rights cases are required to plead facts with specificity." *Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922 (3d Cir.1976). General, unspecific allegations of an actionable municipal policy or

---

11. A municipal custom is a practice of municipal officials that is not authorized by written law, but which is "so permanent and well-settled ... as to [have] the force of law." *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), *citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), *quoted in Harris*, at 504 n. 7.

custom are insufficient to raise a justiciable *Monell* claim. In the cases before the Court, plaintiffs have made vague, conclusory allegations which fall short of the requisite level of specificity.[12] Indeed, even following a thorough review of plaintiffs' complaints, briefs and exhibits, it is extremely difficult to discern exactly what unconstitutional policies or customs Scott County is charged with having promulgated. The vague, conclusory, unspecific nature of plaintiffs' allegations against Scott County is probably a sufficient basis on which to dismiss all such claims. *See Move*, 530 F.Supp. at 765 (complaint against municipal entity dismissed where only vague, conclusory allegations of policy or custom made); *Seiber v. Cooper*, 522 F.Supp. 157, 159 (E.D.Tenn.1981) (absent allegations in complaint that plaintiff's injuries were caused directly by the execution of official governmental policy or custom plaintiff held not to have stated claim against the county); *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42 (2d Cir.1985), *aff'd in part and rev'd in part*, —— U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (plaintiff failed to allege facts sufficient to raise justiciable claim against municipality); *Glaros v. Perse*, 628 F.2d 679 (1st Cir.1980) (complaint so bereft of specific allegations against city that it states no civil rights claim against city); *Ekergren v. City of Chicago*, 538 F.Supp. 770, 773 (N.D.Ill.1982) (general, unspecific allegations fail to state a claim against municipality); *Silo v. City of Philadelphia*, 593 F.Supp. 870, 875 (E.D.Pa.1984) (plain-

---

**12.** The conclusory nature of the plaintiffs' allegations is illustrated by the following survey of the respective complaints:

> In pertinent part, all of the actions alleged herein represent the official deliberate policy or custom of, or were taken pursuant to the guidelines of, Scott County, the Scott County Board of Commissioners, the County Human Services Department.

*Morgenson* Complaint, par. 16; *S. Germundson* Complaint, par. 21;

> In pertinent part, all of the actions alleged herein represent the official deliberate policy, or were taken pursuant to the guidelines of, Scott County, the Scott County Board of Commissioners, the Scott County Sheriff's Department, the Scott County Welfare Department, the City of Jordan, Jordan City Council and the Jordan Police Department.

*Lallak* Complaint, par. 26;

> All of the actions alleged herein represent the official deliberate policy or custom of the office of Scott County Attorney and the Scott County Board.

*Buchan* Complaint, par. 17, *Bentz* Complaint, par. 16; *Myers* Complaint, par. 16; *Brown*, Complaint, par. 14;

> Defendant Scott County Board of Commissioners is the entity responsible for the political and legal actions of Scott County. All actions complained of hereinafter represent the official and negligent supervisory policies of the Scott County Board of Commissioners, and Scott County.

*Meger* Complaint, par. 4. The *Rank* and *Kath* complaints, while naming Scott County as a defendant, contain no mention of an unconstitutional policy or custom whatsoever. Quite obviously, the scattershot technique employed by plaintiffs, wherein "all actions alleged" or "complained of" are said to represent county policy, is scarcely indicative of specific pleading. Furthermore, the *Buchan, Bentz, Myers* and *Brown* complaints attribute the policies or customs alleged to departments not subject to suit, rather than to Scott County. The exception which proves the rule is the *Joe* complaint, wherein policy or custom is pled with specificity:

> 38. The actions of the Defendants, and each of them, were taken under color of state law and were pursuant to the official policy, custom, or usage of Defendants Scott County, Attorney's Office, Sheriff's Office and HSD. This policy, custom, or usage included, but was not limited to, the following:
> a. seeking the immediate removal of all children from the homes of their parents whenever an allegation of sexual abuse of the child had been made from any source, regardless of how credible the allegation was.
> b. denying to all families of children about whom allegations of sexual abuse had been made any of the social welfare benefits mandated by State or Federal law.
> c. fabricating sexual abuse charges with reckless disregard for the truth and willful indifference to the rights of the families of the children about whom sexual abuse charges were made.
> d. forcing individuals to give false testimony in order to obtain criminal convictions and findings of dependency/neglect in family court proceedings.
> e. making use of suggestive and coercive interviewing techniques to elicit false allegations of sexual abuse and to embellish, distort, and reinforce allegations of sexual abuse made by children.
> f. making use of so-called "independent" psychologists and psycho-therapists to ratify and corroborate false allegations.

*Joe* Complaint, par. 38.

tiffs in civil rights cases are required to plead facts with specificity).

However, giving plaintiffs' complaints the benefit of every possible doubt, it is possible to identify some possible policies or customs, as for example those set forth in the Court's original Memorandum and Order: "[e]xamples of ... possible policies or customs include those relating to the manner of conducting the sex ring investigation, the training and supervision of county employees, and the purported failure of HSD to attempt to reunite families whenever possible." *In re Scott County Master Docket*, 618 F.Supp. at 1569. Plaintiffs also appear to allege that Scott County, acting through Morris and the HSD, had a custom or policy of placing children in foster homes rather than with relatives, of changing children's names without parental input, of changing children's religions without regard to their choice in the matter, and of denying the parents the opportunity to visit with their children during the period of foster home placement. Plaintiffs apparently contend that these "customs or policies" were undertaken in derogation of their fourteenth amendment liberty interest in an undisrupted family unit. Plaintiffs further appear to allege deprivation of their fourth amendment rights by virtue of various Scott County policies or customs, including: a policy of retaliatory arrest of Scott County residents who threatened the sex ring investigation or who spoke openly against the prosecutor and/or law enforcement officers; a policy or custom of concealing exculpatory evidence from judicial officers; a policy or custom of fabricating evidence of child abuse, primarily through suggestive questioning of child victim-witnesses. Fairly construed, plaintiffs' allegations of unconstitutional Scott County customs or policies are of four types: (1) a custom or policy of removing children from the home and continuing their separation in derogation of plaintiffs' fourteenth amendment liberty interest; (2) a custom or policy of arresting plaintiffs without probable cause in derogation of their fourth amendment rights; (3) a custom or policy of misleading judicial officers, improperly questioning children, and otherwise conducting the sex ring investigation in an unconstitutional manner; and (4) a custom or policy of inadequately training employees, which in turn caused plaintiffs to suffer constitutional deprivations.

**(b) Deprivation**

Under *Monell* analysis, the first step is to identify the putatively unconstitutional customs or policies and to determine whether these customs or policies "caused" a deprivation of plaintiffs' rights, that is, whether the customs or policies were the "moving force" behind the constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed. 2d 806 (1986); *Clay*, 815 F.2d at 1169.

Plaintiffs claim they were deprived of constitutional guarantees by virtue of Scott County's unconstitutional policy of disrupting the family unit without the benefit of due process of law. Plaintiffs' due process liberty interest claims were extensively analyzed above in connection with the discussion of social worker liability. Based upon that discussion, the Court concludes that plaintiffs simply have not suffered a deprivation of their liberty interests. Whether analyzed as substantive due process claims or procedural due process claims, the separation of children from parents, although inarguably disruptive, was simply not of constitutional magnitude. As noted above, in determining whether a substantive right protected by the due process clause has been violated, it is necessary to balance the interests of the individual against the demands of an organized society. Plaintiffs have a strong and undisputed interest in the "care, custody, and management of their children." However, Scott County also has a strong and undisputed interest in protecting the welfare of children reasonably suspected to be the victims of abuse. Here, plaintiffs allege that Scott County caused their family units to be disrupted in contravention of their right to substantive due process; but as discussed extensively above, plaintiffs have failed to show and cannot show that in the unique setting of these cases the county's

acts amounted to a "brutal and inhumane abuse of official power literally shocking to the conscience." Because plaintiffs have not established the existence of a substantive due process deprivation, it matters not whether a Scott County custom or policy caused the break-up of the family units; in either event, plaintiffs' claims must fail. With respect to plaintiffs' procedural due process claims, as discussed above, plaintiffs received all the process due them. The mere fact that HSD social workers may not have followed state law procedures in all their particulars is irrelevant since a violation of state law is not cognizable under section 1983, as discussed above. Plaintiffs have not suffered a deprivation of their liberty interest in an undisrupted family unit and for that reason their claims against Scott County must fail.

Plaintiffs also claim that they were arrested without probable cause, and apparently claim that Scott County caused this deprivation, either directly through the actions of Morris and/or Tietz or indirectly through the sheriff's failure to properly train his subordinates. In any event, plaintiffs must first establish that they were in fact arrested without probable cause. That is, they must first establish that their fourth amendment rights were in fact infringed. Because plaintiffs fail to surmount this hurdle, it is unnecessary to reach "causation" analysis.

In *Myers* the Eighth Circuit found that defendants had "arguable probable cause" to arrest the plaintiffs involved in that appeal. This finding took place in connection with a discussion of qualified immunity. Here, the focus is not on arguable probable cause, but on *probable cause*, a more stringent standard. In general, probable cause "is a reasonable ground for belief of guilt." *Myers*, 810 F.2d at 1454. "It means 'less than evidence which would justify ... conviction [but] more than bare suspicion.' " *Myers*, 810 F.2d at 1454. The questions of plaintiffs' innocence is "neither dispositive of nor relevant to the ultimate issue in the case ... since 'the Constitution does not guarantee that only the guilty will be arrested.' " *Clay*, 815 F.2d at 1167; *quoting Baker v. McCollan*, 443 U.S. 137, 145, 99

S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). The Constitution prohibits only arrests that are not based on probable cause. *Clay*, 815 F.2d at 1168. The relevant standard was set forth in the Eighth Circuit's recent *Clay v. Conlee* decision:

> Whether [an] arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person arrested] had committed ... an offense.

*Clay*, 815 F.2d at 1168; *quoting Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "Thus, it is the 'facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information' at the time of arrest" which are instrumental. *Clay*, 815 F.2d at 1168.

■ Turning to the facts of these cases, it is clear that viewed in the light of all facts and circumstances known to the arresting officers and of which they had reasonably trustworthy information at the time of the arrests, plaintiffs simply have not suffered any infringement of their respective fourth amendment rights. In *Myers* the Eighth Circuit examined the facts of the *Myers, Rank, Lallak, Buchan, Meger, Bentz, Brown* and *Gould* cases and found that "[i]n light of the facts and circumstances before the deputies, we concluded that their conduct in seeking and performing the arrests was objectively reasonable." *Myers*, 810 F.2d at 1457. Although this finding was made in connection with a discussion of qualified immunity under the arguable probable cause standard, the Court's finding of "objective reasonableness" is instructive in applying the more stringent probable cause standard as well. For example, the arrests of Robert and Lois Bentz were based on accounts of two children who had not been in contact with one another for more than a month; the children's accounts were consistent

with one another and not identical; the children explicitly described games in which children were required to perform and submit to acts of oral sex; and other children previously interviewed had named the Bentz children as victims of abuse. *Myers,* 810 F.2d at 1456. The arrest of Greg Myers was based on statements by three children; one of the children had previously been identified by other children as a victim; and children explicitly described games involving children and adults in which sexual abuse figured prominently. *Myers,* 810 F.2d at 1456. Jane Myers and the Lallaks were arrested on the basis of statements made by two children; the statements were detailed and consistent with the accounts given by other children; in addition, other children had previously implicated the Lallaks. The arrests of the other plaintiffs were also found by the Eighth Circuit to be objectively reasonable. *Myers,* 810 F.2d at 1457. As stated by the Court, "[t]hese accounts were not hearsay or anonymous tips, but were detailed descriptions of criminal activity by suspected victim-eyewitnesses whose names and ages were known to the deputies and were provided to the judicial officers who also found probable cause." *Myers,* 810 F.2d at 1456.

As for the remaining cases, the facts and circumstances known to officers on the dates of arrest establish without dispute that the arresting officers had probable cause to arrest Judy Kath, the Germundsons, the Rawsons, Irene Meisinger and Terry Morgenson. For example, and without meaning to belabor the point, the Court notes the following indicium of probable cause in these cases: KATH—allegations by three children, apparently corroborative physical information; M. GERMUNDSON —allegations by two children, corroborative physical information and Germundson's own statements; S. GERMUNDSON —allegations by two children, each internally consistent and obtained at different times in different interviews; MEISING-ER—allegations by four children; apparently corroborative physical evidence. In the light of the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy in-formation at the time of the arrests, it is clear that plaintiffs simply have not suffered deprivations of their respective fourth amendment rights. Because plaintiffs have suffered no deprivations, their claims against Scott County in this regard must be dismissed.

Plaintiffs point out several instances of arguably suggestive victim-witness questioning, and contend that these flawed interrogative techniques, coupled with other alleged errors on the part of law enforcement officials, such as their alleged failure to fairly and fully document investigative interviews, fatally tainted the officers' probable cause determinations. Plaintiffs also go to great lengths in challenging the credibility of certain children. Because the information relied upon by the officers in making the decisions to arrest was in some respects untrustworthy, plaintiffs contend, the officers were not justified in believing that probable cause to arrest had been established. Conclusory allegations aside, plaintiffs have failed to demonstrate that the information on which the officers relied was known by the officers to be untrustworthy at the time of the probable cause determinations. Further, even accepting that the investigation was flawed in some respects, isolated instances of investigative error and doubts as to the credibility of some victim-witnesses in no way diminishes the substantial quantum of indisputably trustworthy information on which the officers justifiably relied in making the decisions to arrest, *viz.,* physical evidence of abuse, such as contaminated bowling pins and candles and physical examinations of children indicative of abuse, as well as corroborative admissions by adults, principally Marlene Germundson and Robert Kath, and the confession of James Rud himself, whose detailed descriptions of sexual abuse of children lent considerable credence to the accusations later elicited from child victim-witnesses. Isolated instances of flawed investigative technique do not a constitutional deprivation make, particularly given the flood of trustworthy information on which officers justifiably relied.

Finally, plaintiffs allege in conclusory terms that Scott County had a custom or policy of improperly training its employees. Once again, the Court is handicapped by plaintiffs' failure to identify the allegedly unconstitutional customs or policies with specificity. However, it is perhaps reasonable to assume that plaintiffs rely on allegedly unconstitutional training of deputies with respect to arrests and questioning, and improper training of social workers with respect to questioning and foster care placement. Under any construction, it seems clear that plaintiffs have not suffered constitutional deprivations caused by a "custom or policy" under *Monell* standards and that their action against Scott County must fail.

■ It is well accepted that "a supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates." *Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir.1984) (per curiam); *Clay,* 815 F.2d at 1170. If a municipality fails to train its police force, or if it does so in a grossly negligent manner so that it inevitably results in police misconduct, the municipality may fairly be said to have authorized the violations. *Warren v. City of Lincoln,* 816 F.2d 1254, 1262 (8th Cir.1987). "[W]here a § 1983 claim is based on a municipality's alleged failure to prevent misconduct by its employees, the city is liable only where municipal officials can be shown to be directly responsible for the improper actions of their subordinates." *Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir.1987); *Wilson v. City of North Little Rock,* 801 F.2d 316, 322 (8th Cir.1986). "The claimant must demonstrate 'deliberate indifference or tacit authorization [by municipal officials] of the offensive acts by [failure] to take remedial steps following notice of a pattern of such acts by ... subordinates.'" *Harris,* at 504 *quoting Wilson,* 801 F.2d at 322. In *Tuttle,* Justice Rehnquist writing for the plurality noted that because the word " 'policy' generally implies a course of action consciously chosen from among various alternatives ... it is ... difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *Tuttle,* 105 S.Ct. at 2436 (footnotes omitted). Nonetheless, in a series of recent cases, the Eighth Circuit has fleshed out the parameters of municipal liability in the context of a claim that a high-ranking official, typically a police supervisor, failed to adequately train or supervise his subordinates. In general, "a municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference.... 'Deliberate indifference' may be shown by a failure to train, or by conducting a training program in a grossly negligent manner so that police misconduct inevitably occurs." *Patzner,* 779 F.2d at 1367. *See also Marchant v. City of Little Rock, Arkansas,* 741 F.2d 201 (8th Cir. 1984); *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981); *Baker v. McCoy,* 739 F.2d 381 (8th Cir.1984).

■ With this standard in mind, it seems clear that plaintiffs' "failure to train or supervise" claims against Scott County, Morris and Tietz must fail, for several reasons. First and foremost, plaintiffs have failed to surmount the threshold barrier of establishing constitutional deprivations. Plaintiffs simply have not and cannot prove that their rights were infringed. In *City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), a jury returned a finding that a police officer charged with unconstitutional arrest of the plaintiff had not in fact infringed plaintiff's constitutional rights—the arrest was based on probable cause and was not effectuated with excessive force. Based on the absence of a threshold finding of deprivation, the Supreme Court found that the municipality could not under any circumstances be found liable to the plaintiff, stating: "neither *Monell* ... nor any other of our cases authorizes the award of damages against the municipal corporation based on

the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *Heller*, 106 S.Ct. at 1573. Here, plaintiffs have not suffered any constitutional harm at the hands of the deputies or the social workers, hence, their failure to train or supervise theory against Scott County must fail.[13] *See, e.g., Clay*, 815 F.2d at 1169 ("[w]e hold that as a matter of law there was probable cause for [plaintiff's] arrest. That being the case, his arrest did not deprive him of any federal constitutional right, and he thus has no cause of action against [the arresting officer] under § 1983").

Second, plaintiffs have utterly failed to establish that the county officials had notice of prior misbehavior and that its deliberate failure to act upon such notice caused their injury. For example, no evidence has been presented that Tietz had prior notice of arrests made by his deputies without the benefit of probable cause, or that Tietz, armed with such knowledge, deliberately failed to act. In light of the Eighth Circuit's teaching in *Harris, Wilson, Patzner, Marchant, Herrera, Baker, Clay*, and *Warren*, plaintiffs' claims must fail.

### 2. Immunity

██ Even were the Court to accept that unconstitutional policies or customs of Scott County caused plaintiffs to suffer constitutional harm, to the extent the harm is attributable to the actions of Morris, defendants convincingly argue that the county shares the prosecutor's absolute immunity. It is well accepted that a municipality or other governmental entity "may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). Consequently, Scott County may not raise the good faith de-

fense of its social workers and deputy sheriffs as a bar to suit against it. With regard to the absolute immunity of prosecutor Morris, however, there is authority for the proposition that the county may derivatively avail itself of the prosecutor's absolute immunity in a section 1983 action which seeks to hold the county responsible for the prosecutor's actions. *See Armstead v. Town of Harrison*, 579 F.Supp. 777 (S.D.N.Y.1984); *Whelehan v. Monroe County*, 558 F.Supp. 1093 (W.D. N.Y.1983); *Cribb v. Pelham*, 552 F.Supp. 1217 (D.S.C. 1982); *Hancock v. Washtenaw County Prosecutor's Office*, 548 F.Supp. 1255 (E.D.Mich.1982). *But see Wagner v. Genesee County Board of Commissioners*, 607 F.Supp. 1158 (E.D.Mich.1985); *Czikalla v. Malloy*, 649 F.Supp. 1212 (D.Colo. 1986).

In general, immunity defenses to suits under section 1983 have been recognized where the immunity was one "well established at common law" on the date of section 1983's enactment and where public policy and the compensatory and deterrent functions of section 1983 are compatible with such immunity. *Owen*, 445 U.S. at 638, 100 S.Ct. at 1409. In *Owen* the Supreme Court determined that "there is no tradition of immunity for municipal corporations, and neither history nor policy supports a construction of § 1983 that would justify ... qualified immunity" for a municipality. *Owen*, 445 U.S. at 638, 100 S.Ct. at 1409. In support of this conclusion, the Court detailed the public policy considerations militating against derivative qualified immunity, including the injustice to "victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense." *Owen*, 445 U.S. at 651, 100 S.Ct. at 1415. In addition to the interest in compensation of "victims of past abuse," the Court also cited the interest in deterring future constitutional

---

**13.** The Bentzes allege that their arrest was an unconstitutional "pretextual arrest" in that they spoke out against Morris at a public meeting and were arrested two days later on charges of child abuse. The Bentzes do not claim, however, that Morris effectuated the arrest or otherwise caused its commission. Although pretextual arrests are actionable in a section 1983 suit, *Warren v. City of Lincoln*, 816 F.2d 1254 (8th

Cir.1987), in the absence of some affirmative link between the arrest and the alleged pretext, the Bentzes simply have not made out their claim. Further, Morris is absolutely immune (see above discussion), the county derivatively immune, and the deputies qualifiedly immune, if the arrest of the Bentzes was objectively reasonable, which the *Myers* court found that it was.

deprivations, reasoning that, "the knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." *Owen*, 445 U.S. at 652, 100 S.Ct. at 1416 (footnote omitted). As stated by the Court:

> Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those "systemic" injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.

*Owen*, 445 U.S. at 652, 100 S.Ct. at 1416 (footnote omitted).

Undeniably, a finding that a county or municipality may avail itself of a prosecutor's absolute immunity will work to the detriment of those wronged by the exercise of official power. "If the act's purpose is to provide protection to those persons wronged by the misuse of power exercised under state law ... it clearly would result in a frustration of that purpose to deny a remedy to those who were, in fact, injured." *Wagner*, 607 F.Supp. at 1169. Moreover, a central rationale undergirding good faith immunity for state actors—the crushing personal liability which may flow from a finding of liability—is simply not present where the municipality is the defendant, since the cost of defending suit and paying damages, if any, will be "spread among the general public, which is ultimately responsible for the conduct of its officials." *Garner v. Memphis Police Dept.*, 710 F.2d 240, 248 (6th Cir.1983), *aff'd*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). With this in mind, it is clear that the first factor cited by the *Owen* Court, the public's interest in compensating "vic-

tims of past abuse," militates against derivative absolute immunity.

However, this factor may be offset by the strong interest in protecting the discretionary power of public prosecutors, in the limited instance where absolute prosecutorial immunity is invoked by the governmental entity. In *Owen* the Supreme Court suggested that constrained by threats of municipal liability state actors will be inclined to "err on the side of protecting citizens' constitutional rights," and to "institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights," particularly where the infringement derives from the "systemic" interaction of several governmental officials. *Owen*, 445 U.S. at 651–52, 100 S.Ct. at 1415–16. In the context of the public functions at issue in *Owen*, these sentiments are undoubtedly well-founded. However, as pointed out in *Whelehan*, where *prosecutorial* functions are concerned, the "danger of inhibiting public decisionmaking ... is to be given much greater weight." *Whelehan*, 558 F.Supp. at 1106. As expressly stated by the Supreme Court in *Imbler*, "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability" in a suit for damages. *Imbler*, 424 U.S. at 424, 96 S.Ct. at 992. The rationale for this greater protection of prosecutors was exhaustively detailed in *Imbler*: (1) prosecutor impartiality and vigilance could be impaired by the threat of damages actions against them; (2) actions against prosecutors would in all likelihood be frequent; (3) prosecutors required to answer in court to charges of wrongdoing would be obliged to neglect their pressing duties; (4) prosecutors are frequently required to make arguable judgment decisions under serious time constraints thus rendering them especially vulnerable to constitutional claims; (5) prosecutor discretion to call witnesses and present evidence might be impaired; (6) post-trial procedures designed to determine whether an accused has been fairly tried might be compromised if appellate judicial officers acted with "subconscious" knowl-

edge that a ruling in favor of the accused could translate into damages liability for the prosecutor; (7) unlike other public functionaries, a prosecutor is constrained by "professional discipline by ... [his] peers" as well as possible criminal liability pursuant to 18 U.S.C. § 242. *See Imbler*, 424 U.S. at 424–27, 96 S.Ct. at 992–93; *Whelehan*, 558 F.Supp. at 1106.[14]

These compelling policy considerations are manifestly operative where a municipal defendant rather than a prosecutor is the subject of a section 1983 damages claim. "It can scarcely be denied that a defendant who has been acquitted of criminal charges has nothing to lose by commencing a § 1983 action against the prosecutor's municipal employer." *Armstead*, 579 F.Supp. at 782. The fact that it is the municipality which is the named defendant and the municipality which will bear the costs of defense and damages, if any, does not alter the fact that it is the prosecutor who is being hailed into court to answer for his or her actions. Each of the policy concerns enunciated in *Imbler* is implicated in such a suit. Time better spent in the "pressing duty of enforcing the criminal law" will inevitably be diverted to civil defense preparation and appearances. Haunted by the prospect of potential damages actions against their employers, prosecutors may well find their professional judgment and discretion compromised in determining who to charge and what witnesses to call and evidence to present. "[T]he number of claims that may be expected would still pose a significant threat to municipalities' financial stability and consequently to their provision of important services to the public." *Whelehan*, 558 F.Supp. at 1107. Further, as noted in *Whelehan*, the deterrent effect of holding municipalities answerable for prosecutorial misconduct, if any, would

in all likelihood be exerted against the wrong parties, inasmuch as "conscientious and law-respecting" prosecutors could be expected to exercise greater caution in the face of potential constitutional claims against their employers, while "conspicuously lawless" prosecutors, whose conduct is individually actionable in any event to the extent they exceed the bounds of their prosecutorial function, would not be unduly swayed by the threat. *Whelehan*, 558 F.Supp. at 1107–08. Perhaps most significantly, the deterrent impact outlined in *Owen*—the likelihood that policymakers will institute internal rules and procedures designed to prevent systemic injuries—is simply inapplicable in the context of a prosecutor constrained by the very nature of his or her position to make arguable "judgment calls" on short notice in areas of the law which in many if not most cases bespeak a hue of indistinct greyness. As persuasively reasoned in *Armstead:*

> The costs to the public from frivolous claims of malicious prosecution ... are great, and far outweigh the minimal deterrent effect of civil suits on actual prosecutorial misconduct. Whether the government's case is weak or strong, if there is evidence establishing probable cause to believe criminal acts have been performed, the prosecutor should be given every incentive to submit the evidence to the "crucible of the judicial process so that the factfinder may consider it ... to determine where the truth lies." These incentives are not provided if the prosecutor is to be constantly distracted by civil actions under § 1983 that require a judge and jury to second guess the propriety of his acts performed in discharging his core responsibilities.

*Armstead*, 579 F.Supp. at 782–83 (footnote omitted).

---

**14.** In the recent case of *Town of Newton v. Rumery*, —— U.S. ——, 107 S.Ct. 1187, 94 L.Ed. 2d 405 (1987), the Supreme Court reiterated the reasons for judicial deference to prosecutorial decisions as to whom to prosecute.

> Prosecutorial charging decisions are rarely simple. In addition to assessing the strength and importance of a case, prosecutors also must consider other tangible and intangible factors, such as government enforcement priorities. Finally, they must also decide how best to allocate the scarce resources of a criminal justice system that simply cannot accommodate the litigation of every serious criminal charge. Because these decisions "are not readily susceptible to the kind of analysis the courts are competent to undertake," we have been "properly hesitant to examine the decision whether to prosecute."

*Newton*, 107 S.Ct. at 1194 (citation omitted).

Because it is unnecessary to reach the point, in light of the Court's finding of no constitutional deprivation, the Court reaches no conclusion as to whether the county shares the absolute immunity of the prosecutor, but obviously strong arguments can be made that it does.

In sum, plaintiffs' claims against Scott County are deficient as a matter of law, accordingly, the county's motion for summary judgment will be granted. Plaintiffs have failed to plead policy or custom with specificity. Plaintiffs have failed to make a threshold showing of deprivation. Plaintiffs have not shown that Scott County had a policy or custom of arresting without probable cause or improper questioning or separation of children from parents or deception of judicial officers which was unconstitutional and which caused them injury. Plaintiffs have not made out a valid "failure to train or supervise" claim. Scott County's motion for summary judgment will be granted.

## F. Conspiracy

In *Myers* the Eighth Circuit found that the conspiracy claims of plaintiffs against Morris, Tietz, the deputies, social workers and others were without foundation and accordingly summary judgment was entered for defendants. The court concisely summarized the plaintiffs' conspiracy claims:

> The heart of the plaintiffs' case is their position that the children's accounts of sexual abuse were false and the prosecutor, sheriff, sheriff's deputies, guardians, therapists, a court-appointed attorney, and a police officer conspired among themselves and with others to extract fabricated accusations from children in order to target the plaintiffs for prosecution. The alleged purpose of the conspiracy was to invent a "sex ring" as part of a publicity campaign against child abuse and incest undertaken by the conspirators in order to advance the career of the prosecutor.

*Myers*, 810 F.2d at 1452 (footnote omitted). In assessing plaintiffs' conspiracy claims, the court considered "whether [the] asser-

tion of qualified immunity could be defeated by the charge that facially legitimate investigative and reporting functions had in reality been corrupted into a stratagem for the ventilation of false accusations." *Myers*, 810 F.2d at 1452. Accordingly, the court scoured the record for "facts and inferences which, viewed in the plaintiffs' favor, would create a genuine issue of improper purpose." *Myers*, 810 F.2d at 1452. Based on its review of the record, the court concluded that "[t]here is no inference in the pleadings, records or even briefs that Morris, the sheriff and his deputies or the other alleged conspirators ... had the slightest interest in targeting these particular plaintiffs for any personal motives.... Why this diverse group of personalities and offices should have cooperated with each other in a scheme to advance R. Kathleen Morris' career is clarified nowhere in the pleadings, records or briefs." *Myers*, 810 F.2d at 1453. Accordingly, the court concluded that "plaintiffs' assertions of conspiratorial purpose amount to no more than unsupported allegations of malice" uncognizable in a section 1983 action. *Myers*, 810 F.2d at 1453. The court concluded:

> Many people believed that children had been abused by the plaintiffs.... A commonly held belief that a crime has been committed is not a conspiracy. Various people engaged in investigating and reporting suspected criminal activity does not amount to conspiracy. We look for a genuine factual issue of concerted activity toward an unlawful objective....
>
> We have found inadequate record support to create a genuine issue of concerted activity directed at a common goal to achieve an unlawful purpose. Therefore, the pleading deficiencies and lack of evidence of substance sufficient to create a submissible issue of fact require the dismissal of plaintiffs' conspiracy claims.

*Myers*, 810 F.2d at 1454.

The conspiracy claims of the new plaintiffs are no more substantive than those dealt with in *Myers*. Indeed, the new plaintiffs' conspiracy claims mirror the claims made by the original set of plaintiffs. Under the circumstances, the Eighth Circuit's conclusions in *Myers* are fully dispositive

of plaintiffs' conspiracy claims, and summary judgment for all defendants as to the conspiracy claims will be entered. Plaintiffs have alleged nothing more specific than malice or bad faith, and have failed to identify a genuine factual issue of concerted activity toward an unlawful objective. Defendants' motions for summary judgment as to plaintiffs' conspiracy claims will be granted.[15]

## G. Robert Rawson

Plaintiff Robert Rawson has stipulated to dismissal of all claims brought by him with the exception of an "excessive force" claim against Scott County, Sheriff Tietz, deputies Morgan, Busch and Einertson, and "others unnamed." These defendants now move for summary judgment as to Rawson's excessive force claim.

Rawson was arrested November 22, 1983 at his home in Shakopee, Minnesota. Both uniformed and ununiformed officers were involved in the arrest. Plaintiff alleges that in the course of the arrest, deputy Busch and other unidentified arresting officers caused Rawson's arm to be "twisted" behind his back while placing handcuffs on him.[16] Plaintiff alleges that he immediately notified the officers that he was in pain and asked that he be handcuffed with his arms in front, rather than in back. The deputies' response, plaintiff alleges, was to state that they did not have the keys to the handcuffs. When plaintiff continued to protest, Deputy Busch produced a key and the handcuffs were removed and placed in front. Plaintiff now brings this action under 42 U.S.C. § 1983, alleging that the deputies' use of excessive force caused him to suffer a shoulder injury.

Plaintiff acknowledges that prior to the November 22, 1983 incident he had a preexisting shoulder injury, suffered in the course of his employment in 1980. Plaintiff has undergone medical treatment of his shoulder since 1982. Prior to the arrest incident, plaintiff was assigned a fifteen percent permanent disability rating in connection with his shoulder problems. Plaintiff's condition apparently continued to deteriorate up to the date of the arrest incident, as evidenced by the fact that plaintiff complained of increasing pain and discomfort and loss of motion on November 8, 1983, prior to the arrest incident. Following the arrest incident, plaintiff underwent a shoulder arthrogram, which revealed a tear of the right rotator cuff. Plaintiff was admitted to Metropolitan Medical Center on February 1, 1984 and on February 4, 1984, a right shoulder acromioplasty and right rotator cuff repair surgery was performed. Plaintiff was discharged from the hospital February 9, 1984.

Allegations of brutality by law enforcement personnel apprehending a suspect or effecting an arrest are cognizable in a suit brought under section 1983. *New v. City of Minneapolis*, 792 F.2d 724, 726 (8th Cir.1986). However, "§ 1983 does not grant a cause of action for every injury wrongfully inflicted by a state officer." *Mark v. Caldwell*, 754 F.2d 1260, 1261 (5th Cir.), *cert. denied*, 474 U.S. 945, 106 S.Ct. 310, 88 L.Ed.2d 287 (1985). "In determining whether the state officer has crossed the constitutional line that would make the physical abuse actionable under Section 1983, [the Court] must inquire into the amount of force used in relationship to the need presented, the extent of the injury inflicted and the motives of the state officer. If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances, and was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience, it should be redressed under § 1983." *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th

---

15. Because all of plaintiffs' federal law claims are subject to summary judgment or dismissal, plaintiffs' pendent state law claims will be dismissed as outside the subject matter jurisdiction of the Court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

16. Plaintiff also claims he informed the officers of his shoulder injury before he was handcuffed, a factual dispute which the Court need not resolve in light of its finding that defendants did not use excessive force.

Cir.1981), *cited with approval in Raley v. Fraser*, 747 F.2d 287, 289 (5th Cir.1984). "If sufficiently egregious, a deliberate use of excessive force ... can implicate the substantive fourth amendment guarantee against unreasonable seizures, the substantive due process right to be free from abusive governmental conduct 'offensive to human dignity,' or both." *New*, 792 F.2d at 726. In *Davis v. Forrest*, 768 F.2d 257 (8th Cir.1985) the Eighth Circuit approved the use of a four-factor test in determining whether state officers have violated an arrestee's constitutional rights through the use of excessive force: "(1) [t]he need for the application of force; (2) [t]he relationship between the need and the amount of force that was used; (3) [t]he extent of injury inflicted; and (4) [w]hether force was applied in a good faith effort to effectuate the arrest or maliciously and sadistically for the very purpose of causing harm." *Davis*, 768 F.2d at 258.

■ Applying the *Davis* factors to the facts of this case, the Court finds that plaintiff has not raised a justiciable claim of "excessive force" in connection with his November 22, 1983 arrest. Viewed in a light most favorable to plaintiff, plaintiff's claims amount to an allegation that he was handcuffed behind his back, and when he expressed pain, the cuffs were removed and he was handcuffed with his hands in front. Plaintiff has not made any showing that he was handcuffed or otherwise physically abused "maliciously and sadistically for the very purpose of causing harm." Further, although plaintiff undoubtedly suffered some injury, the extent of the injury inflicted must be gauged in relation to the shoulder woes already experienced by him on the date of the arrest. As of that date Rawson had been diagnosed as suffering some permanent injury to his shoulder and had been under a doctor's care for more than a year. In light of these facts, it is extremely difficult to gauge the exact extent of injury caused by the arrest incident. It appears at least as likely as not that the major portion of inju-

ry of which Rawson complains stems from the 1980 work-related incident and not from the 1983 arrest incident.

■ Some physical touching is a necessary corollary to every arrest. The use of force in connection with an arrest rises to the level of a constitutional violation only where the force used is excessive under the circumstances; that is, where the arresting officer's acts literally "shock the conscience." It seems clear in this case that plaintiff merely suffered some discomfort as a consequence of a minimal use of force in connection with a routine arrest. It is highly probative that upon plaintiff's expression of discomfort the arresting officers removed the handcuffs in an attempt to accommodate plaintiff. Such minimal force incident to a routine arrest does not state a constitutional claim. In *Bur v. Gilbert*, 415 F.Supp. 335 (E.D.Wis.1976) plaintiff sought section 1983 damages based upon injuries allegedly suffered by him as a consequence of being handcuffed upon arrest. The court granted defendants' motion for summary judgment, observing that the plaintiff suffered no injury other than an abrasion on his wrists, and that, even assuming the plaintiff was handled discourteously and that the use of handcuffs was not necessary, the use of such minimal force is not uncommon or unusual in the course of an arrest and does not support a finding of liability under section 1983. Similarly, in *Daly v. Pederson*, 278 F.Supp. 88 (D.Minn.1967) the court dismissed section 1983 claims where the excessive force consisted of a shove which was claimed to have aggravated a surgical condition but which did not produce a serious injury. Even accepting plaintiff's version of the facts as true, it seems clear that plaintiff has not suffered the sort of physical abuse shocking to the conscience actionable under the federal civil rights laws. For this reason, the motion of defendants for summary judgment as to Robert Rawson's excessive force claim will be granted.[17]

17. Plaintiff's claims against Scott County and Sheriff Tietz must be dismissed in any event, since these parties did not participate in the arrest and plaintiff has not alleged the existence of an unconstitutional custom or policy which caused his injuries. Plaintiff acknowledges that

## H. Joe Case

The *Joe*[18] case, which arose roughly contemporaneously with the Jordan sex ring investigation, is nevertheless unconnected to that investigation, as all parties concede. The Joes are residents of Spring Valley, Minnesota. Jane and John Joe have six adoptive children, including Lynda, Tom and James Joe. On or about November 1, 1983, Lynda Joe, then aged seven, described to a school teacher certain acts of sexual abuse allegedly directed at her by her brothers Tom, then age 14, and Jim, then age 8. The teacher notified Scott County authorities, who arranged for an interview of Lynda at the Jordan school on November 4, 1983. At the interview Lynda repeated her allegations of sexual abuse. That evening deputies Busch and Pint and social worker Paff caused Lynda Joe to be removed from the Joe home and to be placed in foster care. The protective custody report filed by the deputies listed several factors in support of removal, including the fact that the children who reportedly assaulted Lynda remained in the Joe home, and the fact that Jane Joe, adoptive mother of the Joe children, did not believe Lynda's allegations, and denied that Lynda had ever reported acts of sexual abuse to her, notwithstanding Lynda's claim that she had notified Jane Joe of the abuse. A neglect petition was filed November 9, 1983, and a custody hearing was convened on that date. Pursuant to stipulation of the parties Lynda was continued in foster care pending a psychological evaluation. The psychologist's report, dated December 27, 1983, recommended that Lynda remain in foster care pending further evaluation and therapy. An evaluation by a second psychologist was conducted May 7, 1984. Once again, the examining psychologist recommended that Lynda remain in foster care. Based upon these recommendations, Lynda remained in foster care through October 1984. During the period November 4, 1983 through October 1984 the Joes did not request that Lynda be returned to them and did not seek visitation rights. A neglect-dependency trial was conducted in October 1984, concluding in a finding that Lynda was dependent. Lynda remained in foster care through June 28, 1985, at which time she was returned to her adoptive parents.

Plaintiffs filed this action November 26, 1985, raising various claims under 42 U.S.C. § 1983 and § 1985[19] as well as several pendent state law claims. Named as defendants in the *Joe* action are Scott County, the Scott County Attorney's office, R. Kathleen Morris, deputy sheriffs Einertson, Busch, and Pint, the Scott County Human Services Department, social workers Subby, Paff, Thomas Behr, and Victor Ellingson. Plaintiffs also named as a defendant psychologist Mindy Mitnick; however, by stipulation of dismissal dated April 27, 1987, Mitnick was dismissed from the case.

Defendants now seek summary judgment as to all plaintiffs' claims.

Scott County did not have a custom or policy relative to allowable force during an arrest. Rather, plaintiff bases his claims against Scott County and Tietz on an alleged failure to train and supervise the deputies. However, as discussed extensively above, a failure to train or supervise claim is federally cognizable only upon a showing that the supervising officer, in this case Tietz, had knowledge of past deprivations and nonetheless willfully failed to act to prevent such abuses. Here, plaintiff has failed to allege that Tietz had knowledge of any past exercises of excessive force on the part of his deputies, or that any pattern of excessive force existed at all. Plaintiff bases his failure to train or supervise theory on a single incident, but as the Eighth Circuit made clear in *Herrara, Clay, Warren, et al.*, a single incident will not suffice to establish a supervisor's failure to train or supervise in the absence of proof that the supervisor had knowledge of the abuse and nonetheless willfully failed to intervene.

**18.** The plaintiffs' real names have been concealed pursuant to court order.

**19.** Plaintiffs' section 1985 claims will be dismissed, inasmuch as conduct is actionable under section 1985 only upon a showing of racial or class-based, invidiously discriminatory animus, *O'Neill v. Grayson County War Memorial Hospital*, 472 F.2d 1140, 1144–45 (6th Cir.1973), and here plaintiffs allege individualized discriminatory animus solely. *See Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340 (5th Cir.), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).

### 1. Prosecutor

 Plaintiffs have named Scott County Attorney R. Kathleen Morris as a defendant in this action. Morris' only direct involvement in the case was to participate in interviews of Lynda Joe. Plaintiffs claim that Morris was party to a conspiracy to deny them their constitutional rights. However, as discussed above, it is clear that plaintiffs' allegations of conspiracy are fatally defective. Here, as in *Myers*, "[t]here is no inference in the pleadings, record or ... briefs that Morris, the sheriff and his deputies or the other alleged conspirators ... had the slightest interest in targeting these particular plaintiffs for any personal motives." *Myers*, 810 F.2d at 1453. Nor do plaintiffs explain why "this diverse group of personalities and offices should have cooperated with each other in a scheme to advance R. Kathleen Morris' career." *Myers*, 810 F.2d at 1453. Here, as in *Myers*, "plaintiffs' assertions of conspiratorial purpose amount to no more than unsupported allegations of malice." *Myers*, 810 F.2d at 1453. For this reason, the motion of R. Kathleen Morris for summary judgment will be granted.

### 2. Deputies and Social Workers

Plaintiffs have named the various deputies and social workers as alleged co-conspirators; however, as discussed above, plaintiffs' conspiracy claims do not state a justiciable claim. In addition to their conspiracy allegations, plaintiffs claim that the deputies and social workers contravened their liberty interests in an undisrupted family unit. It is clear that the Joes' claims of substantive and procedural due process deprivations have no more substance than the similar claims made by other plaintiffs, as discussed above. In applying the substantive due process balancing test, the state's interest in protecting the welfare of children reasonably suspected of being abused more than counterbalances plaintiffs' interest in the care and maintenance of their children. Further, in light of the facts known to defendants, their decision to remove Lynda Joe from the home was neither arbitrary nor unreasonable. As of November 4, 1983, the deputies and social workers had knowledge of Lynda's accusations, which coincided with accusations made by her on an earlier date. Under Minnesota law, as discussed above, a child's allegations need not be corroborated. The deputies also had notice of prior problems with the Joe children. Under all the facts and circumstances, the Court finds that plaintiffs did not suffer a deprivation of their rights to substantive due process.[20] Defendants' act of removing Lynda from the home does not shock the conscience, nor can it be said that the social workers failed to exercise professional judgment.[21]

 As to plaintiffs' procedural due process claims, here, as in the sex ring investigation cases, plaintiffs were afforded adequate post-deprivation remedies. Plaintiffs were represented by counsel at the initial neglect proceeding, and in fact stipulated to removal of Lynda from the home pending psychiatric evaluation. The two psychologists who examined Lynda were hand-picked by the Joes. During Lynda's stay in foster care, individualized treatment plans were prepared and administrative reviews conducted. Copies of treatment plans were sent to the Joes and their attorney. The Joes were advised by letter of administrative reviews and were invited to attend. Jane Joe was in attendance at the May 10, 1984 administrative review together with her attorney and co-signed the report. She was also in attend-

---

**20.** Of course, the social workers and deputies are protected by qualified immunity in this case to the same extent as the Scott County sex ring cases, as discussed above.

**21.** Plaintiffs claim that Lynda suffers from primary process lying syndrome and fabricated the allegations. However, plaintiffs do not claim that defendants knew of Lynda's alleged propensity to fabricate as of November 4, 1983. Nor

do plaintiffs explain how or why two psychologists hand-picked by them recommended that Lynda remain in foster care. Plaintiffs' claims that defendants unconstitutionally neglected their duty to reunite the family is undercut by the fact that the parents stipulated to Lynda's removal, two psychologists supported continuing removal, and the Joes did not seek visitation or return.

ance at the November 1984 review along with her attorney. In the context of suspected child abuse, where immediate removal may be necessary to protect the child's health and welfare, the courts, including the Eighth Circuit in *Fitzgerald*, have held that post-deprivation remedies are adequate to protect parents' procedural due process guarantees. In addition, here, as in *Lossman*, the defendants' initial finding of neglect was buttressed by a later court finding, following trial on the merits, that Lynda was in fact dependent. Under the circumstances, there has been no denial of procedural due process.

Plaintiffs also claim that the defendants contravened certain state statutes and regulations in their handling of Lynda's foster care. As discussed above, violations of state law do not state justiciable claims under section 1983.

As to Scott County and Sheriff Tietz, plaintiffs allege in general terms that these defendants promulgated a custom or policy of separating children from parents based upon unreliable accusations, of fabricating evidence, and of improperly questioning child witnesses. Plaintiffs have made no threshold showing of deprivation, and to the extent these allegations are based on prosecutor Morris' conduct, the county shares the prosecutor's absolute immunity. For this reason, the motion of the county and of Tietz for summary judgment will be granted.

Finally, plaintiffs claim that defendant Einertson failed to properly train and/or supervise the deputies. However, here, as in *Myers*, plaintiffs have failed to offer any proof that Einertson had any duty to train the deputies. *Myers*, 810 F.2d at 1464. Further, because the deputies are qualifiedly immune, and because removal of the children was not in derogation of clearly established rights, plaintiffs have not made a threshold showing of deprivation. Depu-

ty Einertson's motion to dismiss will be granted.

In sum, although the *Joe* case is not factually related to the other Scott County cases, the legal analysis detailed above applies and under that analysis it is clear that all of the Joes' section 1983 claims are legally meritless. The motions of all defendants for summary judgment in the *Joe* case will be granted.

### I. Larry Norring

Defendant Larry Norring (Norring) is a Jordan police officer assigned by the Jordan Police Department to the investigation of the "Jordan Sex Ring." Norring played a role in interviewing several child victim-witnesses.[22] Norring now moves for summary judgment in the three civil cases, *Germundson*, *Coralene Rawson* and *Meisinger*, in which he is named a defendant. The Germundsons and Coralene Rawson do not contest Norring's motion.[23] Thus, the only issues remaining before the Court are the claims against Norring of Irene Meisinger and her two children, J.M. and J.R.H.

As discussed above, Irene Meisinger was arrested November 30, 1983 and charged with six counts of criminal sexual conduct in the first degree and six counts of criminal sexual conduct in the second degree. The Meisingers allege that Norring affirmatively fabricated allegations of child abuse against Irene Meisinger, recklessly disregarded the truth, failed to properly investigate, coerced J.M. and J.R.H. Meisinger and other children during interrogations and wrongfully separated the Meisinger family based on fabricated allegations. The Meisingers also allege that no police officer of reasonable competence would have arrested Irene Meisinger based on the facts available to Norring on November 30, 1983 and thus that Norring lacked "arguable probable cause" to arrest.

---

**22.** In *Myers*, the Eighth Circuit affirmed the Court's grant of summary judgment in favor of Norring in the *Lallak* suit on the grounds there was no specific evidence that he played a role in the investigation culminating in the arrests of plaintiffs Charles and Carol Lallak.

**23.** The *Germundson* plaintiffs have conceded that the decision of the *Myers* decision effectively precludes their action against Norring. Plaintiff Coralene Rawson has asked the Court for voluntary dismissal without prejudice of her suit and the disposition of her claims are dealt with in *supra*.

Norring's involvement in the sex ring investigation dates to September 26, 1983 when Christine Brown reported to Norring that her daughter S. Krahl had been sexually abused by James Rud. A similar complaint was made to Norring by Judy Kath regarding her daughter V. Kath. Norring took statements from both S. Krahl and V. Kath and their mothers. Subsequently Norring and/or others interviewed V. Kath on November 14, 15, 17 and 22, 1983 and several times thereafter. In the November 14, 1983 interview V. Kath identified four persons who had abused children and described specific acts performed by them. Irene Meisinger was not among those accused. However, V. Kath did allege that she (V. Kath) was at J.M. Meisinger's residence where she observed R. Rud, James Rud's juvenile brother, performing oral sex on J.M. Meisinger in September 1983. In the November 15 interview V. Kath recounted multiple instances in which five different persons performed sex on each other and upon several children while recording the events with a polaroid camera. Irene Meisinger was not named as one of the adults. On November 17, 1983 Norring and Wilker interviewed V. Kath at the County Attorney's office. In this interview V. Kath stated that on one occasion both Irene Meisinger and James Rud had performed oral sex on each other and then later performed oral sex on both V. Kath and J.M. Meisinger, and that on another occasion Irene Meisinger and other adults performed numerous sexual acts with each other and with children, including her and J.M. Meisinger. In a November 22, 1983 interview V. Kath alleged that Irene Meisinger performed oral sex on J.M. Meisinger, S. Krahl, Judy Krahl and V. Kath as well as being involved in sexual acts with other adults and children.

S. Krahl's first statement given to Norring on September 26, 1983 led to the arrest of James Rud on that date. In that statement she alleged that two days earlier Rud kissed her and her brother and touched them in the genital areas. Norring, together with Wilker and another so-cial worker named Judy Pelz interviewed S. Krahl at her elementary school on November 16, 1983. With the use of anatomical dolls, S. Krahl described sexual acts involving James Rud, Judy Kath, Christine Brown and five children. Neither Irene Meisinger nor her children were implicated in this statement. Exhibit I to Meisinger Memorandum. S. Krahl was removed from her home on that date and placed in foster care. In a November 17, 1983 interview with Norring and Wilker S. Krahl again described sexual acts involving various children and adults, including Irene Meisinger. Norring interviewed J.M. Meisinger on November 18, one day after S. Krahl and V. Kath had identified Irene Meisinger as a child abuser and T. Rud admitted having sex with J.M. Meisinger. At this interview J.M. Meisinger confirmed that she had had sexual intercourse with T. Rud and that Rud had sexual intercourse with V. Kath, and also told Norring and Wilker that she was afraid of her mother. The next interview of J.M. Meisinger apparently [24] took place on November 23 and was conducted by Norring and Deputy Morgan. In this interview J.M. reportedly described having intercourse with T. Rud at James Rud's trailer and of observing sex between James Rud and V. Kath, as well as multiple acts of sexual abuse by several adults on children. Irene Meisinger was not implicated in these events. However, defendant Norring alleges that J.M. stated she was afraid of her mother because her mother allowed her live-in boyfriend to hurt her and her brother. The last interview of J.M. Meisinger took place on November 26. Norring was not present. At this interview J.M. stated that she told her mother about having had sexual intercourse with James Rud, and that her mother continued to allow James Rud to associate with the children. On December 29, 1983 J.M. Meisinger was admitted to the United/Children's Hospital in St. Paul for suicidal tendencies. She remained hospitalized until February 23, 1984.

J.R.H. is the younger brother of J.M. Meisinger. He was first interviewed by

24. No notes or records of this interview are before the Court.

deputy sheriff Busch and social worker Wilker. J.R.H. was seven years old at the time. During this interview he reportedly told Busch that his mother had instructed him not to call the police because if he did, his sister and he would be placed in foster homes. J.R.H. also reportedly described that his mother's boyfriend had physically abused him and once had thrown him down a flight of stairs. J.R.H. also told Busch that he knew things that "would hurt his mom." *See* Affidavit of M. Busch at 4. At least some of these statements are corroborated by the deposition testimony of Anne Buchanan, a psychologist who had been seeing the individual members of the Meisinger family since before the start of the Scott County investigation.

Q: Are the Meisinger children, at least as of the time of your involvement with them in the fall of '83 and into the early winter, did they seem to you to have a high fear level of something?

A: Yes fear was expressed many times.

Q: And was it your judgment that at least part of that fear was directed towards their mother?

A: It was on occasion.

Q: And was some of it directed towards [the boyfriend]?

A: Yes.

Deposition of Anne Buchanan at 76. On November 26 J.R.H. was interviewed for the fourth time by Norring and Kathleen Morris. At this interview J.R.H. stated that on one occasion his mother had performed oral sex on him, and that he had seen Irene Meisinger do the same to J.M. Meisinger.

Based on the information obtained from J.M. and J.R.H. Meisinger and from S. Krahl and V. Kath a criminal complaint charging Irene Meisinger with criminal sexual conduct involving children issued November 30, 1983. Norring was the complaining witness. Irene Meisinger was arrested on that date. Plaintiffs allege that

at the time of Irene Meisinger's arrest and the placement of the Meisinger children in foster care Norring knew that the testimony of S. Krahl and V. Kath was unreliable and impeachable. Plaintiffs point out that even though S. Krahl alleged that Irene Meisinger was a child sexual abuser, notes from an undated Norring report indicate that S. Krahl was unable to pick out Irene Meisinger's photograph.[25] Plaintiffs also allege S. Krahl had a long history of neglect and abuse which was known to Norring and others. Plaintiffs claim that Norring and Wilker intentionally intimidated and upset J.M. Meisinger, and told her she could not go home until she said her mother was a molester.[26] Norring objects to J.M. Meisinger's affidavit on the ground that she is incompetent to testify since the parties agreed that the children involved would not testify unless defendants were given prior notice of this fact by their counsel. Accordingly, Norring argues that J.M. Meisinger's affidavit does not satisfy the competency requirement of F.R.Civ.P. 56(e).

Broadly construed, plaintiffs' complaint against Norring contains five separate causes of action: 1) conspiracy; 2) improper questioning of children; 3) arrest without probable cause; 4) perjury to judicial officers 5) unlawful separation of the Meisinger family in violation of their fourteenth amendment liberty interest. Norring asserts that he enjoys qualified immunity for his entire role in the Scott County investigation and thus is not subject to Meisingers' causes of action.

### 1. Conspiracy

The conspiracy claim made by Meisinger against Norring is no more substantive than the conspiracy claims brought by the other plaintiffs in this matter. "[A] conclusory and unsupported allegation of conspiratorial purpose fails to defeat an assertion of qualified immunity by a defendant otherwise entitled to that defense." *Myers*, 810

---

**25.** Later, in an April 9, 1986 deposition S. Krahl stated she did not know who Irene Meisinger was. This information is not relevant to the issue of probable cause at the time of arrest.

**26.** At oral argument plaintiffs argued that they had informed Norring that the Meisinger children would testify and that Norring had in fact scheduled but later canceled depositions of the children. The Court will not resolve this dispute but it will consider the affidavits.

F.2d at 1453. While it appears that some of the investigative and interview techniques employed by Norring and others may have been in some respects sloppy and unprofessional, there was a considerable amount of corroborated evidence on which Norring and his fellow officers justifiably relied. "A commonly held belief that a crime has been committed is not a conspiracy." *Myers*, 810 F.2d at 1454. The Meisingers' claim of conspiracy will be dismissed due to a lack of genuine issue of fact that Norring acted in concert with others towards an unlawful objective.

### 2. Improper Questioning.

■ As noted above, in *Myers*, the Eighth Circuit concluded that interviewing suspected abused children was a "grey area" in which clearly established legal norms did not yet exist. 810 F.2d at 1460–61. The Meisingers argue that contrary to the Eighth Circuit's assumptions, standards for investigating reports of child sexual abuse were well established in 1983 and throughout the entire Scott County investigation. In support of this argument plaintiffs cite a variety of professional publications dealing with the issue of child abuse investigations.[27] While these materials may well indicate the existence an emerging professional consensus[28] on desirable investigatory procedures, they are not legal standards. *See e.g., Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir.1985) (in absence of binding precedent court should

---

27. Among works cited by plaintiffs are: *Incest, Confronting the Silent Crime: A Manual for Educators, Law Enforcement, Medical, Human Services and Legal Personnel*, (Meldoon, ed. 1979); Chein, *The System's Response to Sexual Abuse of Children*, (1981); Burgess, Groth, Holmstrom, Sproi, *Sexual Assault of Children and Adolescents*, (1978); *American Bar Association National Legal Resource Center for Child Advocacy and Protection, Child Sexual Abuse Cases* (1982).

28. It is generally recognized that overly suggestive questioning can result in the conviction of innocent persons or the loss of the case. *See* Goodman and Helgeson, *Child Sexual Assault: Children's Memory and the Law*, in *Papers, from a National Conference on Legal Reforms in Child Sexual Abuse Cases* (hereinafter "Papers") (ABA Law Reform Project) 41, 55, 57 (1985) Yengish, *Child Sexual Abuse Cases*, 3 UTAH L.REV. 443, 446–47 (1986); Slicker, *Child Sex ˙Abuse: The Innocent Accused*, 91 Case & Comment # 6, 12, 18 (1986). Because young children are frequently the sole or crucial witnesses in these cases, the investigations are fraught with the peculiar difficulties inherent in eliciting reliable information from young frightened victims. As one commentator has noted:

> The first interview with the child is crucial. The credibility of the child must be determined. The evidence must be preserved. If the interviewer comes on too strong, the child may suffer a second trauma. If the interviewer is hostile, the child may close up. If the interviewer is suggesting or demanding, the child may parrot what the interviewer wants, then and afterwards. If the interviewer is too sympathetic, the child may exaggerate to get more sympathy.

Arthur, *Child Sexual Abuse: Improving the System's Response*, 37 Juv. & Family Court J. 1, 15 (1986). Moreover, multiple interviewing of suspected victims can not only cause trauma to the child but also result in "parroting", increased suggestiveness, loss of credibility, and retraction. *See* MacFarlane, *Diagnostic Evaluations and the Use of Videotapes in Child Sexual Abuse Cases*, in *Papers* 121, 122–23 (1985) (discussing dangers resulting from multiple interviews of child); Whitcomb, Shapiro, Stellwagen, *When the Victim is a Child: Issues for Judges and Prosecutors*, (U.S. Dept. of Justice, National Institute of Justice 1985) at 100 (noting that the U.S. Attorney General's Office and National Legal Resource Center for Child Advocacy and Protection and many others have recommended limiting interviews of possible victims); Berliner, *The Child Witness: The Progress and Emerging Limitations*, 40 U.MIAMI L.REV. 167, 170–71 (1985) (discussing efforts of many communities to reduce trauma to potentially abused children caught up in judicial process by specially training interviewers, limiting number of interviews, using special interview rooms and other devices used to reduce "the most obvious and completely unnecessary forms of system-induced-trauma"). In addition, the use of a videotaped first interview is encouraged by many practitioners as a means of preserving the child's memory, helping to prevent families from pressuring children into retractions, preventing improper questioning and reducing the need for multiple interviews. Whitcomb, Shapiro and Stellwagen, *Issues, supra*. at 60; Goodman and Helgeson, *supra*. in *Papers*, 41, 51; Eastman, *Videotaping Interviews with Child Sex Offense Victims*, 7 Children's Legal Rights J. 13, 14 (1986) (noting need for trained professionals and importance of avoiding unduly leading questions). For guidelines on interviewing suspected victims of child sexual abuse see *e.g.*, Flammang, *Interviewing Child Victims of Sex Offenders*, in *The Sexual Victimology of Youth* (1980); Arthur, *Child Sexual Abuse: Improving the System's Response*, 37 Juv. & Family Court J. 1, 15–19 (1986).

examine all available decisional law to determine whether the law is clearly established within the meaning of *Harlow* ). Accordingly, the Court finds that summary judgment is appropriate as regards any improprieties Norring allegedly committed while interviewing children.

### 3. Improper Arrest

On November 30, 1986 Norring caused a criminal complaint to be issued charging Irene Meisinger with criminal sexual misconduct. The complaint was based on the following facts:

1. S. Krahl stated that Irene Meisinger had engaged in sexual acts with children.

2. V. Kath alleged that Irene Meisinger performed sex on her and on J.M. Meisinger.

3. J.R.H. Meisinger stated his mother had performed oral sex on him.

█ As noted above, the issue for qualified immunity purposes is whether "arguable" probable cause existed. 810 F.2d at 1455. Moreover, as the *Myers* court noted, in Minnesota a child's complaint with regard to sexual abuse need not be corroborated. 810 F.2d at 1458, *citing* Minn.Stat. Ann. § 609.347(1) (Supp.1987) in effect in 1984. Based on the information available to Norring on November 30, 1980, at a very minimum officers of reasonable competence could have differed as to the existence of probable cause to arrest Irene Meisinger. *Myers*, 810 F.2d at 1457 *citing Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Accordingly, the Court finds that summary judgment on the issue of Norring's arrest of Irene Meisinger is appropriate.

### 4. Deception of Judicial Officers

The Meisingers contend that Norring intentionally fabricated allegations of child sexual abuse in his criminal complaint against Irene Meisinger. In *Myers* the Eighth Circuit noted that:

> If the allegations of judicial deception represent an attempt to hold the officers accountable for some subjective state of mind such as malice, bad faith or improp-

er motivation, such claims are barred by qualified immunity if the conduct (procuring and making arrests) was objectively reasonable....

*Myers*, 810 F.2d at 1457. The Court finds that even assuming that certain evidence presented by Norring to judicial officers was the subject of dispute, the remaining unchallenged evidence implicating Irene Meisinger was sufficient to create probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (noting that no hearing is required if, after allegedly false material is set to one side, there remains sufficient information in warrant to support finding of probable cause). Thus summary judgment on this count is also appropriate.

### 5. Separation of Parents from Children

█ In *Myers* the Eighth Circuit concluded that the prosecutor and sheriff's deputies were entitled to qualified immunity for the removal of children from their parents because there existed:

> a legitimate question concerning the legality of hastily removing minor children from the plaintiffs' custody upon the arrest of one or both parents for sexually abusing other children, at least, as here, in circumstances where the other children had described abuse by the arrested persons upon their own children.

810 F.2d at 1463. Here, V. Kath had alleged that Irene Meisinger had performed oral sex on both her and J.M. Meisinger. Accordingly, under *Myers* Norring is entitled to summary judgment on this claim as well.

In sum, because he is protected by principles of qualified immunity from claims he arrested without probable cause, improperly questioned, separated children from parents, and deceived judicial officers, and because plaintiffs' conspiracy claim is without foundation, the Court finds that Norring is entitled to summary judgment as to all claims against him in the *Meisinger* case.

### J. Plaintiffs' Motion for Summary Judgment

In the *Myers, Buchan, Lallak, Meger, Joe, Germundson* and *Morgenson* cases

plaintiffs move for summary judgment as to their claims that Scott County, the Scott County Human Services Department and the Scott County Department of Human Services social workers violated various provisions of the federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620 *et seq.* Plaintiffs claim defendants failed to follow federally mandated procedures with regard to the placement and retention of their children in foster care. Specifically, they allege that the department failed 1) to make reasonable efforts to prevent or eliminate the need for removal (42 U.S.C. §§ 671(a)(15), 672(a)(1)); 2) to establish a case plan for each family (42 U.S.C. §§ 675(1), 608(f)(1)); 3) to establish a case review system for each child (42 U.S.C. §§ 675(5), 627(a)(2)(B)); 4) to implement a service program designed to return the children to their family (42 U.S.C. § 627(a)(2)(B)); 5) to make foster care maintenance payments for each child (42 U.S.C. §§ 675(4), 672(a)); and 6) to include each parent in six-month administrative reviews (42 U.S.C. § 675(6)). Plaintiffs further argue that this failure to comply with these statutory provisions creates a section 1983 claim for damages under the reasoning of *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

The AFDC program is a cooperative federal-state program authorized by Title IV of the Social Security Act. 42 U.S.C. §§ 601 *et seq.* The federal government provides financing on a matching fund basis to the states which are responsible for administering the program. *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2132, 20 L.Ed.2d 1118 (1968). Participation in the program is voluntary, but if a state elects to participate it must comply with the requirements of the Social Security Act. *King,* 392 U.S. at 316–17, 88 S.Ct. at 2132–33. The AFDC program includes a foster care provision authorizing disbursements of AFDC foster care funds (AFDC–FC) for children placed in foster care as a result of a judicial determination that the children's homes were not conducive to

their welfare. 42 U.S.C. § 608(a)(1). In 1980 Congress amended Title IV of the Social Security Act by enacting the Adoption Assistance and Child Welfare Act (Act), Pub.L. No. 96–272, 94 Stat. 500, 512 (1980 Act). The 1980 Act "sought to provide the states with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system." *State of Vermont Dept. of Social and Rehabilitation Services v. United States Dept. of Health and Human Services,* 798 F.2d 57, 59 (2nd Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). Specifically it amended the Title IV–B program, 42 U.S.C. §§ 620–628 which concerns state funding provisions for all children in state supervised foster care, as well as created Title IV–E, 42 U.S.C. §§ 670–676 "which provides reimbursement to the states for foster care maintenance and adoption assistance payments made by the states on behalf of eligible children." *State of Vermont,* 798 F.2d at 59.

The 1980 Act amended Title IV–B of the act by authorizing an appropriation of $266 million for each fiscal year for the purpose of "establishing, extending, and strengthening child welfare services." 42 U.S.C. § 620(a). Child welfare services are defined in relevant part under the 1980 Act as public services directed to the purposes of "protecting and promoting the welfare of *all* children." 42 U.S.C. § 625(a)(1)(A). (emphasis added). Thus, its requirements apply regardless of whether the child is otherwise eligible for AFDC funds. For any year after 1979 in which more than $141 million is appropriated under section 620(a) [29], states are not entitled to the additional funds unless they take certain steps including implementing and operating to the satisfaction of the Secretary:

(B) a case review system [as defined in section 675(5) of this title] for each child receiving foster care under the supervision of the State; and

---

**29.** Nothing in the record before the Court indicates what dollar amounts were budgeted under

§ 620(a) in any year.

(C) a service program designed to help children, where appropriate, return to families from which they have been removed or be placed for adoption or legal guardianship.

42 U.S.C. § 627(a)(2).[30] In addition, Title IV–B of the 1980 Act requires that if appropriations in any two fiscal years after 1979 exceed $266 million, states will have their allotments reduced to 1979 levels unless they have, among other steps, implemented the case review system and service programs specified in section 627(a)(2) as well as "a preplacement preventive service program designed to help children remain with their families." 42 U.S.C. § 627(b)(3).

The 1980 Act also replaced the AFDC–FC program under Title IV–A of the Act with a newly created title IV–E program codified at 42 U.S.C. § 671 *et seq.* Under Title IV–A, as a condition of eligibility for AFDC–FC funds, state agencies were required to develop plans for each child under state-supervised foster care. But Title IV–A nowhere defined what was required by such a plan. *Lynch v. Dukakis*, 719 F.2d 504, 507 (1st Cir.1983). The 1980 Act provided such a definition.[31] *See* 42 U.S.C. § 675(1). It also imposed a number of other requirements on eligibility for AFDC–FC funds. *See* 42 U.S.C. § 671.

### 1. Applicability of the Act

■ In general, AFDC aid is available only for "dependent" children in a family setting as defined by 42 U.S.C. § 606(a). That section provides in relevant part:

> The term "dependent child" means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home ... or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepsister, uncle, aunt, first cousin, neph-

**30.** The case review system referred to in subsection (a)(2) of section 627 is defined as:

> (5) ... a procedure for assuring that—
> (A) each child has a case plan designed to achieve placement in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child,
> (B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship, and
> (C) with respect to each such child, procedural safeguards will be applied, among other things, to assure each child in foster care under the supervision of the State of a dispositional hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than eighteen months after the original placement (and periodically thereafter during the continuation of foster care), which hearing shall determine the future status of the child (including, but not limited to, whether the child should be re-

turned to the parent, should be continued in foster care for a specified period, should be placed for adoption, or should (because of the child's special needs or circumstances) be continued in foster care on a permanent or long-term basis); and procedural safeguards shall also be applied with respect to parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation privileges of parents....

42 U.S.C. § 675(5).

**31.** Section 675(1) provides:

> The term "case plan" means a written document which includes at least the following: A description of the type of home or institution in which a child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title; and a plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan....

ew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) at the option of the State, under the age of nineteen and a full-time student in a secondary school (or in the equivalent level of vocational or technical training), if, before he attains age nineteen, he may reasonably be expected to complete the program of such secondary school (or such training)[.]

Section 608(a) of the Act, however, provides that certain children who are in foster care, and thus not within the requisite family setting of section 606(a) are still eligible for AFDC aid:

(a) the term "dependent child" shall, notwithstanding section 606(a) of this title, also include a child (1) who would meet the requirements of such section 606(a) or of section 607 of this title except for his removal after April 30, 1961, from the home of a relative (specified in such section 606(a)) pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or as a result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child, ... and (4) who (A) received aid under such State plan in or for the month in which such agreement was entered into or court proceedings leading to such determination were initiated, or (B)(i) would have received such aid in or for such month if application had been made therefor, or (ii) in the case of a child who had been living with a relative specified in section 606(a) of this title within 6 months prior to the month in which such agreement was entered into or such proceedings were initiated, would have received such aid in or for such month if in such month he had been living with (and removed from the home of) such a relative and application had been made therefor[.]

42 U.S.C. § 608(a). It is clear that foster children are eligible children under section 608(a) only if they would otherwise qualify, but for their removal from their home, under sections 606(a) or 607 (not applicable). *See, e.g., Native Village of Stevens v. Smith,* 770 F.2d 1486, 1488 n. 1 (9th Cir. 1985) (noting that states need only make foster care payments to children who meet the requirements of either sections 606(a) or 607), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986); *Lynch v. Dukakis,* 719 F.2d 504, 507 n. 3 (1st Cir. 1983) (same). Whether a child is a "needy" child within the meaning of section 606(a) is determined by state standards, *Burns v. Alcala,* 420 U.S. 575, 578, 95 S.Ct. 1180, 1183, 43 L.Ed.2d 469 (1975); *King v. Smith,* 392 U.S. 309, 318, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968), although federal law determines which income criteria must be considered in making that determination. *See, e.g.,* 42 U.S.C. § 602(a)(7), (8).

Plaintiffs argue that Title IV–E mandates that preventive services be provided to all children to be placed in state-supervised foster care, regardless of whether those children ultimately qualify for AFDC–FC payments. They cite to a recent decision of the department of Health and Human Services Grant Appeals Board which found that expenses incurred prior to a child's placement in foster care were properly refundable as necessary administrative expenses even if the child ultimately was found not to qualify for AFDC–FC funds. (Decision No. 844, Docket No. 85–209, Mar. 2, 1987) (Decision 844). The Board reasoned that preplacement efforts should be reimbursed because 42 U.S.C. § 671(a)(15)[32] requires that before placing a child in foster care the State must first make reasonable efforts to prevent or eliminate the need for removal of the child from his home or to make it possible for the child to return home. This could only be done prior to a determination of eligibility. Decision 844 at 7. While this may be true as a general proposition, section

---

**32.** The board also reasoned that if the preventive measures under section 671(a)(15) failed then under 42 U.S.C. § 671(a)(16) the state would be required to begin developing a case plan and case review system. This overlooks the fact that the requirement under section 671(a)(16) only applies "to children receiving funds under the State plan."

671(a)(15) nonetheless only requires the state to make *reasonable* efforts to prevent removal or make it possible to return home. The Court finds that where probable cause exists to believe that parents have sexually abused their children, the state is not required to make efforts to prevent removal or facilitate return. *See In Re Frances,* 505 A.2d 1380 (R.I.1986). Moreover, plaintiffs have made no showing that their children were needy children under Minnesota eligibility standards and thus "dependent" children within the meaning of 42 U.S.C. § 606(a) or that Scott County otherwise received federal matching funds for the foster care of plaintiffs' children. Quite to the contrary, it appears that none of plaintiffs involved in this motion [33] were entitled to AFDC assistance at the time of the removal of their children from their homes. Affidavit of Eileen Moran. In addition, all foster care maintenance payments to the plaintiffs were made from the Scott County Social Service Fund. Affidavit of Eileen Moran. Accordingly, none of the provisions of the 1980 Act regarding AFDC funds under Title IV–E apply to this case.

However, plaintiffs are correct that Title IV–B does impose requirements with respect to all children, regardless of whether they are otherwise eligible for AFDC–FC funds. It is undisputed that defendants did not comply with the requirements of Title IV–B, and in particular with the dictates of 42 U.S.C. § 627(a)(2) and (b). It is, therefore, appropriate to consider whether this failure to comply with section § 627 provides a cause of action for damages under section 1983.

## 2. Existence of Private Cause of Action to Enforce the Social Security Act

 The Court concludes that the failure of defendants to comply with the statutory requirements pertaining to foster care is not actionable in a damages action under 42 U.S.C. § 1983 in the context of home removals resulting from suspected child sexual abuse. In *Maine v. Thiboutot,* 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–2506, 65 L.Ed.2d 555 (1980) the Supreme Court held that section 1983 provided a private cause of action against state officials for failure to comply with federal laws. However no remedy under section 1983 is available where: 1) the federal law did not create an enforceable right or 2) Congress foreclosed private enforcement of the statute through the section 1983 remedy. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981).

Plaintiffs have placed primary reliance on the case of *Lynch v. Dukakis,* 719 F.2d 504, 512 (1st Cir.1983) where the court found that a state's systematic lack of compliance with the case plan and review obligations regarding foster care children under Title IV–E of the Social Security Act was actionable under section 1983. *Lynch* involved a class action which sought only to force the state to comply with the requirements of the Act and did not seek damages. Defendants contend that *Lynch* is not applicable to this case and suggest that the more recent case of *Lesher v. Lavrich,* 784 F.2d 193 (6th Cir.1986) should control the outcome. *Lesher* involved a section 1983 action brought by the mother and stepfather of two supposedly neglected children seeking damages and return of the children because of the state's failure to comply with the pre-placement preventive service program required by Title IV–B under 42 U.S.C. § 627(b)(3). The *Lesher* court distinguished the *Lynch* case and held that the failure of the state to comply with the Social Security Act was not actionable under 42 U.S.C. § 1983:

> [T]he rationale supporting the First Circuit's decision in *Lynch* has no applicability to the present case. *Lynch* was a class action, brought to force the State of Massachusetts to revise its child protec-

**33.** Only the Meisinger family was eligible for AFDC benefits and they are not a party to this motion.

tion procedures.... The plaintiffs did not seek damages, nor did they seek to undo prior child protective actions taken by the State—they sought only to force the State to institute ... the procedures required by ... the Act.

It may be reasonable to read the Adoption Assistance Act to permit parents and children affected by the programs it funds to sue to force those programs to comply with the federal funding requirements; however, the instant action presents entirely different issues....

We think it obvious that whatever rights the Adoption Assistance Act might confer on parents, relief nullifying a prior state court judgment of child neglect or dependency, or awarding damages in connection therewith, would not be available.... Such a result would permit even clearly abusive parents to escape the State's child protection apparatus, and could not have been any part of the Congressional intent underlying the rights that may be established by the Act.

784 F.2d at 197–98.

The Court finds the reasoning and analysis of the *Lynch* court to be persuasive. The major objectives of the Adoption Assistance and Welfare Act of 1980 were to prevent unnecessary placement of children into foster home situations and to prevent children who were placed in foster care from getting "lost in the system." H.R. Rep. No. 96–136, 96 Cong. 1st Sess. 46 (1979). The legislative history to the Child Adoption Assistance strongly suggests that Congress was sensitive to the need for flexibility on the part of state administrators dealing with removal of children from homes due to allegations of child abuse. Thus in regard to the preventive services requirement (42 U.S.C. § 627(b)(3)) of the Adoption Assistance Act the House Ways and Means Committee Report states:

[T]he Committee recognizes that the preventive services requirement would be inappropriate in certain specific circumstances. This would be the case where the home situation presents a substantial and immediate danger to a child which would not be mitigated by the provision of preventive services. In this case the amendments would allow placement without prior provision or offering of preventive services, regardless of whether there had been a judicial determination....

The Committee recognizes that the entire array of possible preventive services are not appropriate in all situations. The decision as to the appropriateness of specific situations will have to be made by the administering agency having immediate responsibility for the care of the child.

H.R.Rep. No. 96–136 at 47. In addition to intending state agencies to have flexibility with respect to preventive services, Congress also intended them to have flexibility with regards to reuniting children with their families. Thus, 42 U.S.C. § 627(a)(2)(C) on which plaintiffs rely only requires "a service program designed to help children, *where appropriate*, return to families from which they have been removed...." (Emphasis added). Clearly, it would be inappropriate to consider returning children to their families where probable cause existed that the parents were child sexual abusers and criminal charges against the parents were pending. Similarly, the purpose of the case review requirement in section 675(1) is primarily aimed at preventing children from remaining in foster care indefinitely and to facilitate early return to families. It would be unthinkable to consider returning the children into their home environment until the question of child sexual abuse had been resolved. The Social Security Act itself recognizes the grave danger associated with child sexual abuse. *See* 42 U.S.C. § 602(a)(16) (requiring state agencies with reason to believe that a child receiving AFDC funds is abused to bring the matter to the attention of the appropriate court or law enforcement agencies in the state). In this case the children were under court custody as the result of child sexual abuse proceedings. They were not "lost in the system." There have been no allegations that defendants systematically ignored the statutory directives imposed by the Act

 

with respect to the great majority of children in foster care. Accordingly, the Court finds that defendants failure to comply with the requirements of the Social Security Act is not compensable in damages under section 1983. *See Harpole v. Arkansas Dept. of Human Services,* 820 F.2d 923, 928 (8th Cir.1987) (Title IV of Social Security Act did not create enforceable rights so as to permit damages action against state which had failed to protect a child from a dangerous home environment); *Scrivner v. Andrews,* 816 F.2d 261, 264 (6th Cir.1987) (reaffirming *Lesher* holding that damages are not available in a section 1983 action alleging violation of Adoption Assistance Act).

Plaintiffs' motion for summary judgment will be denied.

Accordingly, based on the foregoing, and upon all files, records and proceedings, herein,

IT IS ORDERED that:

1. Scott County's motions for summary judgment as to all claims made against it in these consolidated cases are granted;

2. the Scott County Human Services Department's motions for summary judgment as to all claims made against it in these consolidated cases are granted;

3. the social workers' (Doris Wilker, Margaret Subby, Mary Tafs, Judy Dean, Rachel Paff, Karen Kandik, James Poulos, Thomas Behr and Victor Ellingson) motions for summary judgment as to all claims made against them in these consolidated cases are granted;

4. the deputy sheriffs' (Michael Busch, Patrick Morgan, David Einertson and Norman Pint) motions for summary judgment as to all claims made against them in these consolidated cases are granted;

5. Larry Norring's motions for summary judgment as to all claims made against him in these consolidated cases are granted;

6. Sheriff Tietz' motions for summary judgment as to all claims made against him in these consolidated cases are granted;

7. R. Kathleen Morris' motions for summary judgment as to all claims made against her in these consolidated cases are granted;

8. plaintiffs' motions for summary judgment are denied;

9. state law claims made by plaintiffs in these consolidated cases are dismissed without prejudice pursuant to the Court's discretion.

LET JUDGMENT BE ENTERED ACCORDINGLY.